56 A.3d 830

**STATE of Maryland**

v.

**Andre JOHNSON.**

**No. 0782, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Nov. 30, 2012.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellant.

Marc A. DeSimone, Jr. (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, WRIGHT, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

It is exceedingly difficult for a reviewing judge to be less than demanding. It somehow cuts against the judicial grain to accept that a conclusion one can prove ineluctably to be imperfect may nonetheless be adequate. Possessing such a talent, however, is a core value of the reviewing process.

We described in *State v. Amerman*, 84 Md.App. 461, 463, 581 A.2d 19 (1990), the tightly confined standard that constrains a suppression hearing judge when reviewing the earlier decision of another judge to issue a search and seizure warrant based on that first judge's finding of probable cause:

> The controlling principle dictating this reversal of a suppression order is that when a judge, either at a pretrial suppression hearing or at trial, sits in review of another judge's earlier determination that probable cause existed to issue a search and seizure warrant (or an arrest warrant), *the reviewing judge sits in an appellate-like capacity with all of the attendant appellate constraints.*

(Emphasis supplied).

### A State Appeal

The appellee, Andre Johnson, was charged with two counts of possession of narcotic drugs with the intent to distribute. He moved pre-trial in the Circuit Court for Baltimore County to have suppressed physical evidence that had been seized in a warranted search of his residence. Following a suppression hearing on May 25, 2012, the court ruled that the search warrant was not supported by probable cause and that the evidence would, therefore, be suppressed. The State filed a notice of appeal from that ruling pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12–302(c). That subsection provides that the "appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court." The record in this case was filed on August 13, 2012. Accordingly, our decision must be rendered no later than December 11, 2012.

## A Shifting Perspective

 The relationship between a suppression hearing judge and the determination of probable cause can be a tricky one. It shifts dramatically in moving from the warrantless setting to the very different setting wherein a judicially issued warrant is involved. The reviewing judge must shift gears accordingly. In the warrantless situation, the judge is the ultimate fact finder, determining the existence or absence of probable cause. Where a judicially issued warrant is being reviewed, by contrast, the suppression hearing judge enjoys no such freewheeling latitude. As we announced at the top of this opinion, the suppression judge, in that reviewing posture, "sits in an appellate-like capacity with all of the attendant appellate constraints."

Under those "attendant appellate constraints," the suppression hearing judge may well be called upon to uphold the warrant-issuing judge for having had a substantial basis for issuing a warrant even if the suppression hearing judge himself would not have found probable cause from the same set of circumstances. In *State v. Amerman,* 84 Md.App. at 464, 581 A.2d 19, we stressed the difference between those conclusions of the suppression hearing judge that are material and those other conclusions by the same judge that are, in a given review posture, utterly immaterial:

> Under the circumstances, it is perfectly logical and not at all unexpected that a suppression hearing judge might say, *"I myself would not find probable cause* from these circumstances; *but that is immaterial. I cannot say that the warrant-issuing judge* who did find probable cause from them *lacked a substantial basis to do so; and that is material."* There is a Voltairean echo, "I may disagree with what you decide but I will defend with my ruling your right to decide it."

(Emphasis supplied).

 In the context of a warrantless search, the suppression hearing judge focuses directly on the existence of probable cause. The focus comes naturally for it is the type of first-level call that a trial judge habitually makes on a daily basis.

In the very different world of reviewing someone else's warrant, by contrast, the suppression hearing judge must focus on the less familiar issue of whether the warrant-issuing judge was or was not in legal error. That is a second-level call, and a totally different type of decision. The validity of the warrant, needing only a "substantial basis" (regularly described as something less than probable cause), does not necessarily depend on the solidly established existence of probable cause. The law's preference for police resort to judicially issued warrants is so hydraulically powerful that the courts, by way of the practical endorsement of that preference, will uphold a warrant even should the warrant-issuing judge have been technically wrong in the assessment of probable cause.

Where one comes out on a given proposition is a function of where one goes in. The answer is controlled by the precise question that is asked. In looking at a set of facts, is the judge being asked to determine probable cause or is the judge being asked to review another judge's ruling in that regard? In trying to make this critical distinction as perspicuous as possible, we gave in *Amerman*, 84 Md.App. at 464 n. 2, 581 A.2d 19, the unusual but theoretically possible example of how the difference in standards could operate:

> The same discipline could, indeed, constrain *a suppression hearing judge even when reviewing his own earlier issuance of a warrant, Trussell v. State*, 67 Md.App. 23, 25–29, 506 A.2d 255 (1986), *cert. denied*, 306 Md. 514, 510 A.2d 260 (1986). "*Although I would not*, as a matter of fact, *find probable cause* from these circumstances *today, I cannot say*, as a matter of law, *that I was legally in error when I did so yesterday. I, therefore*, have no choice at this juncture and in this more confining capacity but to *uphold my earlier warrant, although I am frank to admit that I would not reissue it.*"

(Emphasis supplied).

### Applying the Wrong Test

■ In the case before us, the flaw in the suppression hearing judge's analysis became clear in the opening sentence of his announcement of his decision:

I do give deference to the issuing judge. That being the case, *the standard still is whether there is probable cause* for the warrant to issue.

(Emphasis supplied). After a thorough-going analysis of the immaterial probable cause issue, his conclusion made his use of the erroneous standard of review unmistakable:

Thus, *I do not find that there was probable cause for the issuance of the warrant* for the reviewing judge to issue that warrant.

(Emphasis supplied). This is indisputably a case wherein the wrong standard was applied. It is precisely the flaw that was before this Court in *State v. Jenkins,* 178 Md.App. 156, 162, 941 A.2d 517 (2008):

*[T]he suppression hearing court determined that the warrant was invalid because the warrant application had failed to establish probable cause. Our reversal of the suppression order is based,* in part, *on our conclusion* that *the suppression court evaluated the wrong predicate and applied, therefore, the wrong standard of judicial review.* We find that the suppression court made a direct ruling on the sufficiency of the warrant application itself, as if it were being called upon to issue the warrant, instead of conducting a more deferential appraisal of another judge's earlier ruling on that subject, to wit, on [the warrant-issuing judge]'s decision to issue the warrant. *The direct focus was on the warrant itself rather than on the distinct question of whether [the warrant-issuing judge] had some substantial basis for issuing the warrant.*

(Emphasis supplied).

The suppression hearing judge's resort to the probable cause standard rather than to the substantial basis standard was not, as the appellee blithely dismisses it, a mere insignificant slip of the tongue. It was the critical employment of a wrong standard, a mistake readily capable of producing a dispositively different result.

## The Warrant Application

■■ The ambit of our review, precisely the same as the suppression hearing judge's review, is bounded by the four corners of the warrant application. The question before us is not whether probable cause existed that evidence would be found in the residence to be searched but whether the judge who issued the search warrant had a "substantial basis" for so finding. Clearly there was such a substantial basis.

The warrant application consisted of five single-spaced typed pages. The application recounted, in far more elaborate detail, the following evidence. On December 4, 2010, as the culmination of an extended incident of road rage on the Baltimore beltway, the driver of a gold-colored Ford Taurus, displaying Maryland registration plates 5FMY72, pulled a black handgun from his waistband and fired two or three shots in the general direction of the victim, who was driving a van. As the victim called 911 and reported the incident, the Ford Taurus fled out of sight.

A check of the tag number established that the vehicle was registered to the appellee and that his address was 64 Handworth Way in Parkville. A Baltimore County police surveillance at that address spotted the suspect vehicle, driven by one Tavon Jamal Frisby as its sole occupant, arrive at the residence approximately seven hours after the shooting. Frisby was arrested. Frisby also listed his address as 64 Handworth Way. The Ford Taurus was searched and no handgun was found. The vehicle appeared to have been thoroughly cleaned. The victim was brought to the scene and he identified Frisby as the person who had fired the shots at him. From both a red bandana pointed to by Frisby during the road rage encounter and from information provided by the Baltimore County Police Gang Unit, there was a strong inference that Frisby was a member of a gang known as the Bloods and had been for at least two years.

Although what was ultimately found in the search of 64 Handworth Way led to charges against the appellee, the antecedent suspicion that resulted in the issuance of the

warrant was focused exclusively on Tavon Jamal Frisby, the underaged son of the appellee who lived at the same address. As the warrant application noted, "Frisby's date of birth is February 2, 1992 (18 years of age), which makes him ineligible to legally purchase a handgun."

Frisby was in the Baltimore County Detention Center from December 4 through December 13, 2010. An intercepted telephone call between him and an unidentified female during that time period revealed his concern about the reaction of someone named "Tony" to the shooting incident, his necessity of promptly seeing Tony and explaining things, his intention of getting a gun from Tony, and his reassurance that "they searched my car and didn't find anything."

On January 25, 2011, the police conducted a surveillance of 64 Handworth Way. They observed Frisby arriving at the address in a dark blue Toyota, with Maryland tags 7MD2706. That car was registered to the appellee at that address, just as was the gold Ford Taurus. Frisby unlocked the front door and entered the residence carrying a backpack. Frisby left the residence approximately five minutes later without the backpack. He drove off in the blue Toyota.

Detective Donald Frederick, in an undercover vehicle, attempted to follow Frisby but deliberately did not follow too closely. He recognized, through his "training, knowledge and experience," that Frisby was making "counter surveillance" maneuvers. Frisby repeatedly made "quick lane changes" and "doubled back in the opposite direction." Detective Frederick then broke off the surveillance.

The application was for a warrant to search 64 Handworth Way and both the gold Ford Taurus and the blue Toyota. What the police were looking for were 1) notes, phone numbers, and documents evidencing gang activity involving Frisby and "Tony"; and 2) the handgun, either that used in the beltway shooting or the one Frisby intended to get from Tony. With respect to evidence of gang involvement, the application asserted:

Based upon their training, knowledge and experience Detective Frederick and Sgt. Atteberry know that individuals involved in the above criminal activity will keep notes, phone numbers of co-conspirators and believes the subject identified in the phone conversation as "Tony" will be identified from these records. *Detective Frederick and Sgt. Atteberry also know through their training, knowledge and experience that individuals involved in gang activity will also keep records and items related to that activity, including initiation documents, contacts for other gang members and/or information of potential targets/victims, and items such as colors (bandanas) and insignias representing their gang affiliation.*

(Emphasis supplied).

With respect to the handgun, the application asserted:

Detective Frederick and Sgt. Atteberry also know from the above phone conversation that *this defendant, who is prohibited from possessing a handgun is attempting to, or has acquired a handgun.* Possibly the handgun used in the commission of this offense, and that *handguns are a possession that individuals prize and do not readily dispose of.* Detective Frederick and Sgt. Atteberry also know through this same training, knowledge and experience that *these individuals will often times store or conceal these items at their place of residence, on their person and or vehicles they own or are currently using.*

(Emphasis supplied).

We hold that the warrant application provided a substantial basis for the issuance of the search and seizure warrant. We offer no opinion as to whether the application established probable cause, because on the issue of suppression it simply does not matter. Probable cause is not the test.

### What A Reviewing Judge Must Not Do: Determine Probable Cause *De Novo*

Once a duly authorized judicial officer has issued a search (or arrest) warrant, any subsequent review of that

decision—at a suppression hearing, on a suppression motion at trial, or on appeal—must be appropriately deferential. The reviewing judge does not presume to assess, as of first impression, the existence of probable cause. That would be to do all over again, redundantly, what had already been done by the first judge. The prohibition of such *de novo* redundancy was clearly set out by the Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983):

> We have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review.

Within the year, this Court was on board with *Ramia v. State,* 57 Md.App. 654, 660, 471 A.2d 1064, *cert. denied,* 300 Md. 154, 476 A.2d 722 (1984):

> *Illinois v. Gates* leaves no room for doubt *that reviewing courts, at the appellate level or at the suppression hearing level, have no business second-guessing the probable cause determinations of warrant-issuing magistrates* by way of *de novo* determinations of their own.

(Emphasis supplied). Within months, Chief Judge Robert C. Murphy wrote to a similar effect for the Court of Appeals in *Potts v. State,* 300 Md. 567, 572, 479 A.2d 1335 (1984) ("After-the-fact judicial scrutiny of the affidavit should not take the form of *de novo* review.").

In *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Court repeated the prohibition, but with an exclamation point. The Supreme Judicial Court of Massachusetts had held that a search warrant was invalid because the credibility of an anonymous informant had not been adequately established. 390 Mass. 562, 568–70, 458 N.E.2d 717 (1983). The United States Supreme Court sternly reversed:

> Instead of merely deciding whether the evidence viewed as a whole provided a "substantial basis" for the Magistrate's finding of probable cause, *the court conducted a de novo*

*probable-cause determination. We rejected just such after-the-fact, de novo scrutiny in Gates.*

466 U.S. at 732–33, 104 S.Ct. 2085 (emphasis supplied).

The Court of Appeals of Maryland has consistently followed suit. Judge Harrell stressed the prohibition on *de novo* review in *Greenstreet v. State,* 392 Md. 652, 667–68, 898 A.2d 961 (2006):

> We do so [reviewing a warrant] not by applying a *de novo* standard of review, but rather a deferential one.

See also *Patterson v. State,* 401 Md. 76, 89–90, 930 A.2d 348 (2007). What the suppression hearing judge should not concern himself about was made transparently clear in *State v. Amerman,* 84 Md.App. at 463, 581 A.2d 19:

> The issue is no longer the familiar one of whether probable cause exists; that has already been determined by someone else.

If prohibited from making a *de novo* assessment of probable cause, what then should the reviewing judge do instead?

### What A Reviewing Judge Should Do: Be Content With A Substantial Basis

In *Fitzgerald v. State,* 153 Md.App. 601, 627, 837 A.2d 989 (2003), *aff'd,* 384 Md. 484, 864 A.2d 1006 (2004), this Court switched to affirmative terms to praise a suppression hearing judge for doing what a reviewing judge should do:

> Once again [the suppression hearing judge] commendably recognized the constraints on her reviewing role. *She did not presume to find probable cause. That was not her job.* What *she found* was *that [the warrant-issuing judge] had had a "substantial basis" for finding probable cause. That was her job.*

(Emphasis supplied).

The relatively lower hurdle that must be cleared by an application for a search warrant is that it must provide a "substantial basis" for the issuance of the warrant. *Illinois v.*

*Gates* described that lower hurdle, 462 U.S. at 236, 103 S.Ct. 2317:

> Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had *a "substantial basis for ... conclud[ing]" that a search would uncover evidence* of wrongdoing, the Fourth Amendment requires no more.

(Emphasis supplied). See also *Massachusetts v. Upton,* 466 U.S. at 732–33, 104 S.Ct. 2085.

The Maryland case law has never varied in its commitment to a "substantial basis" as the controlling standard for reviewing a warrant. As Chief Judge Murphy wrote for the Court of Appeals in *Birchead v. State,* 317 Md. 691, 701, 566 A.2d 488 (1989):

> Our review of the judge's decision to issue the search warrants is limited to whether there was *a substantial basis for concluding that the evidence* sought *would be discovered in the place described* in the application for the warrant.

(Emphasis supplied). See also *Greenstreet v. State,* 392 Md. at 667, 898 A.2d 961 ("We determine first whether the issuing judge had a substantial basis to conclude that the warrant was supported by probable cause."); *McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675 (1997); *State v. Lee,* 330 Md. 320, 326, 624 A.2d 492 (1993); *State v. Faulkner,* 190 Md.App. 37, 47, 985 A.2d 627 (2010) ("The [Supreme] Court reasoned that the preference for warrants dictates that their validity be upheld in 'doubtful or marginal cases.' "); *State v. Coley,* 145 Md. App. 502, 521, 805 A.2d 1186 (2002); *Braxton v. State,* 123 Md.App. 599, 620–22, 720 A.2d 27 (1998); *Trussell v. State,* 67 Md.App. 23, 29, 506 A.2d 255 (1986).

### "Substantial Basis" Is Less Than "Probable Cause"

■ Terms such as "substantial basis" and "probable cause" can be, however, frustratingly slippery. The one thing we can be certain about is their relative weight when compared with each other. A substantial basis is less weighty and

less logically probative than probable cause. A tightly reasoned examination, for instance, might reveal a subtle logical flaw in the posited probable cause, but the substantial basis test would not subject the warrant application to so rigorous an analysis. The preference for the warrant and the resulting presumptive validity of the warrant will be able to cover over flaws that might be more compromising if one were examining probable cause in a warrantless setting. Fine points in the arguable nexus between the street criminality of the suspect and the police entitlement to search his home for evidence might well constitute such a case wherein the relative intensities of the examinations might produce very different conclusions. What we know for certain is that some warrant applications will past muster under the lesser test that would not pass muster under the more demanding test.

If all of the law's language about the preference that should be extended to a warrant actually means anything, it clearly implies that if at a suppression hearing, for example, the State needed a grade of "C" to sustain a warrantless search, it would almost certainly squeak by with a grade of "D" if it had gone to the trouble of getting a search warrant. That, after all, is the reward for getting a warrant. Although it is difficult to quantify the difference, there is a difference.

The Supreme Court made it very clear in *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), that the same quantum of suspicion that might not suffice in the warrantless context might well carry the day when a warrant application is being reviewed:

> [W]hen a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, *the reviewing courts will accept evidence of a less "judicially competent or persuasive character* than would have justified an officer in acting on his own without a warrant."

(Emphasis supplied).

Conversely, in *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), the Supreme Court stressed the difference by pointing out that a warrantless search

requires more by way of probable cause than does an application for a search warrant:

Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

If probable cause were an absolute value or a mathematical immutability, those words would be pointless.

This Court, early on in its institutional life, sat en banc in *Hignut v. State,* 17 Md.App. 399, 413, 303 A.2d 173 (1973), and applied that discernible distinction in the quality of the acceptable evidence in the respective contexts:

*We are admonished,* in the interests of enhancing the Fourth Amendment protection, *to "accept evidence of a less 'judicially competent or persuasive character* than would have justified an officer in acting on his own without a warrant.'* " Under that mandate, the furthering of valuable liberties under *the Fourth Amendment requires that we read possibly ambiguous language with an eye toward upholding the warrant rather than toward striking it down.*

(Emphasis supplied).

More recently, this Court reaffirmed the lesser standard for assessing a substantial basis in *State v. Jenkins,* 178 Md.App. at 174, 941 A.2d 517:

The case law overwhelmingly demonstrates that *finding a "substantial basis" for the issuance of a warrant means something less than establishing probable cause* in the context of reviewing warrantless police activity.

(Emphasis supplied).

Judge Deborah Eyler spoke to the same point in *State v. Faulkner,* 190 Md.App. 37, 47, 985 A.2d 627 (2010):

*The substantial basis standard involves something less than finding the existence of probable cause* and is less demanding than even the familiar "clearly erroneous" stan-

dard by which appellate courts review judicial factfinding in a trial setting.

(Emphasis supplied). And see *Ferguson v. State,* 157 Md. App. 580, 593, 853 A.2d 784 (2004); *State v. Coley,* 145 Md.App. at 521, 805 A.2d 1186.

### A Prima Facie Case Is Not Required

 In order to satisfy the substantial basis test, the warrant application need not establish a legally sufficient or prima facie case. *Illinois v. Gates,* 462 U.S. at 235, 103 S.Ct. 2317, was emphatic in that regard:

> [I]t is clear that only the probability, and *not a prima facie showing,* of criminal activity is the standard of probable cause.

(Emphasis supplied).

Justice Rehnquist's opinion went on to explain why the substantial basis test entails no such rigorous a legal examination of the warrant application:

> We also have recognized that *affidavits "are normally drafted by nonlawyers* in the midst and haste of a criminal investigation. *Technical requirements of elaborate specificity* once exacted under common law pleadings *have no proper place in this area."* Likewise, *search and arrest warrants long have been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of "probable cause."*

*Id.* (emphasis supplied). Simply to reread that passage makes the Supreme Court's message unmistakably clear that although rubberstamping a warrant might sometimes be a problem, holding a warrant to too high a standard can be a comparable problem and sometimes, at the hands of overdemanding reviewers, an even greater problem.

In line with that clear directive, this Court held in *State v. Amerman,* 84 Md.App. at 473, 581 A.2d 19:

> Thus, while the "clearly erroneous" test demands some legally sufficient evidence for each and every element to be

proved—to wit, that a prima facie case be established—*Illinois v. Gates* rejected such a rigorous standard for establishing probable cause and opted instead for a "totality of circumstances" approach wherein an excess of evidence as to one aspect of proof may make up for a deficit as to another.

See also *McDonald v. State*, 347 Md. 452, 467, 701 A.2d 675 (1997); *State v. Coley*, 145 Md.App. at 521, 805 A.2d 1186.

## The Constitutional Values Protected By the Substantial Basis Standard

Animating the seemingly latitudinarian standard of review for a judicially issued warrant is not some "pro-State" or "anti-defendant" bias. It reflects a deliberate policy decision by the Supreme Court that the most effective way to protect the Fourth Amendment guarantees of all citizens is to encourage the police to eschew reliance on warrantless searches and seizures and to defer to the impartial judgment of neutral and detached magistrates. The regularly reiterated preference for warrants is the Supreme Court's practical way of rewarding law enforcement when it follows the recommended procedures and of withholding that preference when it does not. *Illinois v. Gates*, 462 U.S. at 236 n. 10, 103 S.Ct. 2317, could not have been more direct in setting forth both the Court's policy and its strategy in support of that policy:

> We also have said that "[although] in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, *the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." This reflects both a desire to encourage use of the warrant process by police officers* and a recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.

(Emphasis supplied). The Supreme Court told reviewing judges both what to do and how to do it:

A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *"A grudging or negative attitude by reviewing courts toward warrants," is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant;* "courts should not invalidate [warrants] by interpreting [affidavits] in a hypertechnical, rather than a commonsense manner."

462 U.S. at 236, 103 S.Ct. 2317 (emphasis supplied).

The Supreme Court explained that if warrants are subjected to too tight a scrutiny, the police may deem it inappropriate to rely on them.

*If the affidavits* submitted by police officers *are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches,* with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search.

*Id.* (emphasis supplied).

By way of supporting the preference for the warrant, *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), had earlier admonished reviewing courts to "call the close plays" in favor of the magistrate's decision to issue the warrant:

Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, *the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.*

(Emphasis supplied).

In *Herbert v. State,* 136 Md.App. 458, 486–87, 766 A.2d 190 (2001), this Court described the Court's strategy of employing incentives and disincentives in order to further police resort to the warrant process:

Over the course of decades, *the Supreme Court* has not been content to deliver to American prosecutors and American police a schoolmarmish civics lesson or lecture on investiga-

tive restraint. It *has, in an exercise of shrewd practicality, provided prosecutors and police with significant incentives for searching and seizing via the favored or preferred modality,* to wit, with judicially issued warrants. *Conversely, it has strewn the field with at times vexing disincentives for operating in the disfavored or non-preferred modality,* to wit, warrantlessly.

(Emphasis supplied).

Maryland has religiously recognized the preference that must be extended to warrants. *Birchead v. State,* 317 Md. at 701, 566 A.2d 488 ("[W]e generally pay great deference to a magistrate's determination of probable cause."); *Malcolm v. State,* 314 Md. 221, 229, 550 A.2d 670 (1988) ("As the key protection from unreasonable government searches, warrants continue to be favored by law."); *Potts v. State,* 300 Md. at 572, 479 A.2d 1335 ("... giving the magistrate's determination the great deference mandated by those cases ..."); *Valdez v. State,* 300 Md. 160, 169–70, 476 A.2d 1162 (1984); *Ferguson v. State,* 157 Md.App. at 593, 853 A.2d 784; *Thompson v. State,* 62 Md.App. 190, 206–07, 488 A.2d 995 (1985).

In *Volkomer v. State,* 168 Md.App. 470, 486, 897 A.2d 276 (2006), Judge Kenney referred to the preferred status of warrants in terms of the warrant's enjoying a presumption of validity:

When the State seeks to introduce evidence obtained pursuant to a warrant, *"there is a presumption that the warrant is valid[,]"* and "[t]he burden of proof is allocated to the defendant to rebut that presumption by proving otherwise." *The presumption that a search warrant is valid provides an incentive to police officers to seek judicial approval before effectuating a search.* ("When *the State* has procured evidence of guilt by the favored and preferred modality of a warranted search, it *is rewarded by a presumption of validity in favor of its warrant application.").*

(Emphasis supplied). See also *West v. State,* 137 Md.App. 314, 322, 768 A.2d 150, *cert. denied,* 364 Md. 536, 774 A.2d 409 (2001) ("Reviewing courts ... pay great deference to that

determination. Reflecting a preference for the warrant process...").

In manifesting the preference for a warrant, an important factor is the dialogue that should be taking place between the court reviewing the warrant application and the American policeman. As we observed in *Herbert v. State,* 136 Md.App. at 489–90, 766 A.2d 190:

> The Supreme Court is telling judges generally to use "straight talk" with American police officers, *convincing them that it will be "to their advantage" whenever they take the trouble to get warrants.*
>
> The incentive of having the "close calls" go in one's favor is particularly strong when fine balances of probable cause are on the scales. Although there is a tendency to think, with Gertrude Stein, that probable cause is probable cause is probable cause, the reality is not always that clear-cut. When the probable cause issue is right on the cusp, when it teeters at the brink and could be nudged in either direction by a feather, *the Fourth Amendment's preference for warrants asserts itself as the critical tie-breaker.* Most frequently, to be sure, the "call" as to probable cause will be "up" or "down" regardless of the investigative modality. Statistically, however, *there will be enough agonizingly close calls over the course of an investigative season to make it a pronounced advantage to hold the tie-breaker in one's pocket.*

(Emphasis supplied).

### The Suppression Ruling and The Question of Nexus

In major measure, the suppression hearing judge ruled that the warrant application failed to establish probable cause because of its failure to show a nexus between Frisby's suspected criminal activities and his home. The analysis began:

> Having reviewed the warrant, having reviewed the applicable cases, I do not find that there was *a nexus between*

*Tavon Frisby's alleged criminal activity on December 4th and his home.*

(Emphasis supplied).

We initially note that, contrary to that analysis, Frisby's end of the nexus was not confined to Frisby's alleged criminal activity on December 4, 2010. The warrant was to search the home where Frisby lived and the two family automobiles to which he had access. The search was, to be sure, in part for the black handgun that Frisby fired on the morning of December 4. The search, however, was also for any handgun that Frisby might have been able to obtain from "Tony," as he expressed his intention of doing, at some time following his release from jail on December 13. Frisby was too young to possess a handgun legally and either weapon would have been a legitimate target of the search. With respect to the weapons, the application for the warrant had recited:

> Detective Frederick and Sgt. Atteberry also know from the above phone conversation that *this defendant, who is prohibited from possessing a handgun is attempting to, or has acquired a handgun.* Possibly the handgun used in the commission of this offense, and that *handguns are a possession that individuals prize and do not readily dispose of.* Detective Frederick and Sgt. Atteberry also know through this same training, knowledge and experience that *these individuals will often times store or conceal these items at their place of residence, on their person and or vehicles they own or are currently using.*

(Emphasis supplied).

The application for the warrant was also concerned with Frisby's possible gang-related activities, with a gang known as the "Bloods." That was an ongoing activity, right up to the time of the search. Implicating Frisby in this regard was not simply the recorded telephone conversation from the jail, his confrontational display of the red bandana on his wrist, but also the facts that Frisby had been stopped by the County Police Gang Unit in 2005 in the company of two individuals known to be "Blood" gang members and that Frisby had been

arrested in 2008 with a known "Blood" gang member.[1] With respect to possible evidence of gang membership and activity, the warrant application recited:

> Based upon their training, knowledge and experience Detective Frederick and Sgt. Atteberry know that *individuals involved in the above criminal activity will keep notes, phone numbers of co-conspirators and believes that the subject identified in the phone conversation as "Tony" will be identified from these records.* Detective Frederick and Sgt. Atteberry also know through their training, knowledge and experience that *individuals involved in gang activity will also keep records and items related to that activity, including initiation documents, contacts for other gang members and/or information of potential targets/victims, and items such as colors (bandanas) and insignias representing their gang affiliation.*

(Emphasis supplied).

The suppression hearing court's analysis, however, focused exclusively on the gun used by Frisby on the morning of December 4:

> Pointing out that *immediately on, or at least very quickly after the December 4th incident, the shooting occurred,* Frisby's home was placed *under surveillance* until Frisby arrived. That was for some seven hours between the shooting and the actual arrest of Mr. Frisby, between 9:30 and 4:30. *It was noted that he had not entered the dwelling prior to his arrest from the time of the shooting until his arrest and that there was no opportunity for him to secrete the weapon on or about that location.* It was also pointed

---

1. In *State v. Amerman,* 84 Md.App. at 484, 581 A.2d 19, this Court looked to numerous Supreme Court precedents in holding that prior arrests (or even reputation) are significant factors in the probable cause equation:

> The Supreme Court case law makes it clear that not only prior convictions but also prior arrests and even a criminal reputation may be significant factors in the probable cause equation.

out in the warrant that his vehicle as well as his person were thoroughly searched for the weapon without success. (Emphasis supplied).

■■■■ That is more than we know. Except for the rare circumstance wherein the court might be probing for evidence of actual police perjury or deliberate falsehood under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a court reviewing a warrant—trial court or appellate court—is confined within the four corners of the warrant and warrant application, with no supplementation permitted. The initial shooting in this case occurred at approximately 9:30 in the morning of December 4. The warrant application does not tell us at what time the police surveillance team arrived at 64 Handworth Way. The application merely recites, "Vehicles responded to the area of that residence and maintained surveillance until the vehicle arrived there." The suppression hearing court inferred that this was "immediately" or "at least very quickly" after the shooting. That was an inference adverse to the validity of the warrant, moreover, whereas "the Fourth amendment requires that we read possibly ambiguous language with an eye toward upholding the warrant rather than toward striking it down." *Hignut v. State,* 17 Md.App. at 413, 303 A.2d 173. That is the wrong tilt to give arguably ambiguous allegations.

The entire automotive confrontation between Frisby and his victim occurred on the northeastern quadrant of the Baltimore Beltway between Essex and Towson. 64 Handworth Way is in Parkville, just a few blocks outside the Beltway between the Belair Road and Harford Road exits. After Frisby finished shooting, he could readily have driven home and dropped off his handgun before the police arrived there. It does not conclusively follow that "there was no opportunity for him to secrete the weapon on or about that location." The warrant application, moreover, made it clear that there were other objects being sought by the warrant. The suppression hearing court's analysis went on:

The detectives relied on *a monitored conversation* while the Defendant was incarcerated *wherein Mr. Frisby states that he is going to get a gun when he gets out of jail.* This in and of itself is insufficient to find probable cause in that at this juncture these are merely hollow words without any corroboration or action to substantiate the fact of what his intent was.

(Emphasis supplied).

The monitored conversation, however, was very significant in terms of suggesting possible gang involvement and certainly with respect to the obtaining from Tony of a handgun which Frisby could not lawfully possess. A possibly inculpatory conversation, moreover, does not need corroboration. There was an unambiguous intent expressed to get a gun even if we do not know what Frisby then intended to do with the gun. Possessing the gun would in and of itself be a criminal act.

The suppression court's analysis continued:

At this point the detectives do conduct surveillance again on his residence on January 25, 2011 and Mr. Frisby is observed entering and leaving the home.

That snippet of surveillance does show, however, that Frisby was in the dark blue Toyota on January 25, 2011, one of the two cars for which the search warrant was obtained. It showed, moreover, that he entered his residence that day with his own key, a residence wherein, it was alleged, he was likely to keep such items as a handgun, ammunition, evidence of gang membership, etc. The surveillance had him entering his home with his backpack and leaving without. He presumably dropped of some of his property at home.

Before ruling that there was no probable cause to show a nexus between Frisby and his home, the analysis concluded:

He is followed and ultimately eludes the police, as mentioned, with certain evasive driving tactics. The Court does not—*I don't find that those evasive tactics,* if that's what the detectives were relying on to find corroboration of the phone call, *were sufficient for probable cause. There are many explanations for these evasive tactics.* I don't know

whether he knew that they were police following him. Maybe he thought they were other people. maybe he thought they were other gang members following him. Could be anybody. He might have thought it was the police following him, but *that in and of itself is not illegal activity.* That doesn't show anything relative to the gun or any nexus to the home.

(Emphasis supplied).

The use of evasive driving maneuvers may not be criminal *per se,* but it is heavy duty evidence of a sense of guilt. It raises the suspicion that Frisby may have had something in the car he did not want the police to see. That would strengthen the case for the search of the car. The evasive maneuvers also raised the suspicion that Frisby was going somewhere that he did not want the police to know about. That might help to establish his gang connections. The analysis points out other and possibly innocent inferences that might explain the unquestionably bizarre behavior. The required "tilt" of the warrant reviewing court, however, is to seek out those inferences favorable to the warrant, not those adverse to it. The analysis at this suppression hearing was basically not warrant-friendly. That attitude is critical.

### The Preference For a Warrant–Friendly Attitude

There is, of course, the law, but there are also extralegal vibrations. The thrust of this opinion has been to communicate the Supreme Court's prime directive over the course of fifty years, as well as the Maryland case law's implementing of that prime directive, that a reviewing court is enjoined to approach the examination of a judicially issued warrant with a warrant-friendly attitude. That is what the overarching concepts of "the preference for a warrant" and "the presumptive validity of a warrant" are all about. Reduce fifty years of rhetoric to a nutshell and what it says is that the reviewing judge should approach the warrant with a smile.

### The Case Law on Proof of Nexus

There is some case law in Maryland that arguably could support both a pro-nexus and an anti-nexus conclusion when

applied to the facts in this warrant application. The immediate problem this creates for the defense, of course, is that there would be, therefore, a substantial basis to support the warrant-issuing judge's decision, whichever way he should rule. If the judge should conclude that the nexus is established and that the warrant should issue, there is case law that gives him a substantial basis for so ruling. If, on the other hand, the judge should conclude that a nexus is not established and that the warrant should not issue, there is also case law, assuming hypothetically that the State could appeal in such a case, giving him a substantial basis for not issuing the warrant. Because of the way in which our review of warrants is structured, the warrant-issuing judge is in a win-win situation. He has a substantial basis for whatever he wants to do. Conversely, the party seeking to challenge the decision of the warrant-issuing judge will be in a lose-lose situation. The deck is unquestionably stacked in favor of the warrant-issuing judge, as the Supreme Court has consistently mandated it should be.

Nonetheless, it behooves us to look at the case law on the subject of proving a nexus between street criminality and the criminal's home.

## A. The Anti–Nexus Case: *Agurs v. State*

The opinion in which the defense will desperately seek succor is *Agurs v. State,* 415 Md. 62, 998 A.2d 868 (2010). For a variety of reasons, however, that opinion may provide the defense with cold comfort. The search warrant under review in *Agurs* called for the search of four persons, of two residences, and of five vehicles. The bottom-line decision was that no sufficient nexus was established between any observed criminal activity on the part of Agurs himself and his home at 3 Six Point Court in Windsor Mill so as to justify the search of that residence.

The immediate problem for the defense is that there may not have been an authoritative opinion for the Court for whatever it is that the defense would like to rely on. Judge

Greene wrote the opinion of the Court and was joined by Chief Judge Bell and Judge Harrell for a solid core of three judges. Judge Battaglia, on the other hand, declined to join in the opinion, albeit agreeing with the decision. She is not committed to any statement made nor any analysis engaged in, except that Agurs goes free. Judge Barbera and Judge Adkins were in complete dissent. Judge Murphy concurred in Part A of Judge Greene's opinion but otherwise dissented. The authoritative majority opinion of the Court, therefore, is limited to Part A of Judge Greene's opinion. Part A runs from page 84 to page 87 of 415 Maryland Reports.

In other parts of the *Agurs* opinion, in which Judge Murphy did not join, there are, to be sure, observations and statements made about the proof of nexus which the defense unquestionably would like to deploy. Only Part A, however, speaks for the majority of the Court and only Part A, therefore, is the prevailing law of Maryland.

A further complication is that the Court was not called up to render an opinion on whether the warrant application actually established a nexus for the search of Agurs's home. Both the trial court and the Court of Special Appeals had determined that it had not, and the Court of Appeals simply accepted those determinations as a given. The Court declined to grant certiorari on the question of a substantial basis for issuing the warrant.

> The State presented a conditional cross-petition for review of the Court of Special Appeals' conclusion that there was no substantial basis for the warrant authorizing the search of Agurs' home. *We did not grant certiorari on that question.*

415 Md. at 68 n. 3, 998 A.2d 868 (emphasis supplied). The opinion formally considered only the "good faith" exception to the exclusionary rule.

> *This case concerns our application of the "good faith" exception to the exclusionary rule,* as established by the United States Supreme Court in Leon and applied by this Court in *Patterson* and other cases. Application of this

exception involves the *Fourth Amendment to the United States Constitution, Leon,* and cases applying *Leon.*
415 Md. at 75, 998 A.2d 868 (emphasis supplied).

On two or three occasions, the *Agurs* opinion took note of the fact that the allegations aimed at establishing the criminal behavior of Agurs himself were very thin. "[The affidavit] also provided limited facts suggesting that Agurs was involved with drug distribution," e.g., 415 Md. at 88, 998 A.2d 868. Interestingly, the opinion was thus looking at the near end of the nexus continuum. The reasoning seemed to be: The lesser the criminal behavior, the lesser the likelihood that the criminal would have something to hide in his residential safe haven.

In this case, by contrast, the allegations of Frisby's criminal behavior at the near end of the nexus were stronger and more direct. The assault with intent to murder and the possession of the handgun on December 4, 2010 were witnessed directly by the assault victim. The expressed intention of obtaining a gun from Tony and thus illegally possessing it was caught on Frisby's monitored telephone conversation from the jail. Inferences of Frisby's likely involvement with gang-related activities could be made from Frisby's possession and use of the gun on December 4, from his flaunting of the red bandana as an insignia of gang membership on that same date, from the monitored telephone conversation about Tony and obtaining a gun, and from his known association with "Blood" members in both 2005 and 2008. In this case, there was thus no weakness at that criminal behavior end of the nexus. This is a significant distinction between this case and *Agurs.*

Part A of the opinion, in which Judge Murphy joined, discussed the nexus requirement generally. *Agurs* relied heavily on *Holmes v. State,* 368 Md. 506, 796 A.2d 90 (2002), and *State v. Coley,* 145 Md.App. 502, 805 A.2d 1186 (2002). In both of those cases, it was held that the nexus between a suspect's criminal activity and his residence had been adequately established. As expressed by Judge Wilner in *Holmes,* 368 Md. at 522, 796 A.2d 90, no direct inculpatory

activity has to be observed at the home, as long as there is some reason to infer that evidence will be found there:

> *Direct evidence that contraband exists in the home is not required for a search warrant;* rather, *probable cause may be inferred from the type of crimes, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items.* The thrust of [cases stating this rule] was characterized by the court in [*United States v. Thomas,* 989 F.2d 1252, 1255, 300 U.S.App.D.C. 380, 989 F.2d 1252 (D.C.Cir.1993) ], in a unanimous *per curiam* opinion by a panel that included now Supreme Court Justice Ruth Bader Ginsburg, that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, *if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence."*

(Emphasis supplied).

As quoted by *Agurs,* 415 Md. at 85, 998 A.2d 868, *Holmes* also pointed out that the linkage, to be sure, is not automatic but requires some showing:

> [T]he mere observation, documentation, or suspicion of *a defendant's participation in criminal activity will not necessarily suffice, by itself,* to establish probable cause that inculpatory evidence will be found in the home. *There must be something more that,* directly or by reasonable inference, *will allow a neutral magistrate to determine that the contraband may be found in the home.*

368 Md. at 523, 796 A.2d 90 (emphasis supplied).

*Agurs,* 415 Md. at 85, 998 A.2d 868, pointed out that the *Holmes* conclusion was buttressed by one observation of criminal activity near the home, although neither *Holmes* nor *Agurs* suggested that such an observation was a *sine qua non* for the establishment of the required nexus:

> We concluded that a nexus existed between Holmes' alleged drug sales and his home because, among other things, the

*police had observed Holmes in a drug transaction that occurred less than a block from his home, they had seen him frequently enter and exit his home around the time of the transaction.*

(Emphasis supplied).

The *Agurs* Court also quoted with approval Judge Kenney's statement for this Court in *State v. Coley,* 145 Md.App. at 527, 805 A.2d 1186, that although some evidence pointing to the home is required, it need not be direct evidence:

*The approach* used by Maryland, the U.S. Court of Appeals for the Fourth Circuit, and other jurisdictions *requires some nexus be established, even in the absence of direct evidence,* between the nature of the items sought and the place where they are to be seized.

(Emphasis supplied).

In *Coley,* this Court had relied in part on the police belief that "drug traffickers ... were likely to store contraband in their homes" but the police in that case had also both information from an informer and Coley's entering and exiting of his house "before and after controlled buys." Neither *Agurs* nor *Holmes* nor *Coley* ultimately provided a definitive statement of what the proof of nexus requires:

As *Holmes* and *Coley* suggest, *we have never provided a definitive test for establishing whether a sufficient nexus exists* between alleged criminal activity and the suspected criminal's home.

*Agurs,* 415 Md. at 86, 998 A.2d 868 (emphasis supplied).

Not only did *Agurs* not announce any bright-line rule with respect to the proof of nexus; neither did it call into question the continuing vitality of *Mills v. State,* 278 Md. 262, 363 A.2d 491 (1976), and *State v. Ward,* 350 Md. 372, 712 A.2d 534 (1998), both of which we will be discussing *infra.* Indeed, the *Agurs* opinion did not mention those cases, notwithstanding the fact that they were very prominently thrust forward by the very cogent dissent of Judge Barbera (joined by Judge Adkins), 415 Md. at 110–112, 998 A.2d 868. Both *Holmes v. State* and *State v. Coley,* on which *Agurs* relied heavily, had, in

turn, relied heavily on both *Mills v. State* and *State v. Ward.* For present purposes, it is enough to note that *Mills v. State* and *State v. Ward* have been neither reversed nor overruled.

Because the ultimate decision went the defendant's way, however, *Agurs v. State* at least gives the defense in this case a talking point—but not much more than that.

**B. The Pro–Nexus Cases: *Holmes, Coley, Mills, Ward, Faulkner, Behrel***

**1. *Holmes v. State***

In addition to *Holmes v. State, supra,* and *State v. Coley, supra,* there are *Mills v. State, supra; State v. Ward, supra; State v. Faulkner,* 190 Md.App. 37, 985 A.2d 627 (2010); and *Behrel v. State,* 151 Md.App. 64, 823 A.2d 696 (2003), on the pro-nexus side of the balance scale. The issue in *Holmes* was precisely what it is in this case:

> The ultimate issue in this regard is one of nexus: *could* a neutral magistrate—*the issuing judge—reasonably infer* from these observations *that drugs and other evidence* of controlled dangerous substance violations *was likely to be found in petitioner's home?*

368 Md. at 519, 796 A.2d 90 (emphasis supplied).

*Holmes* was a drug case. Although there was evidence there that Holmes was in and out of his residence shortly before and after a drug transaction, the Court's holding did not turn on that point. The nexus, to be sure, is not automatic, but the type of additional proof necessary to establish nexus may well be not a direct observation involving the home but only the reasonable allegation that certain types of evidence are regularly stored or hidden in a suspect's home. The *Holmes* analysis provides strong support for a pro-nexus finding in the present case.

*Holmes* relied heavily on *Mills v. State* and *State v. Ward.* In both of those cases the evidence sought was a weapon. In neither of those cases had any observation been made at the home itself. In each of those cases, the Court of Appeals relied on deductive reasoning that a weapon was a valuable

chattel of a type not to be lightly disposed of and the type of thing likely to be kept in one's home or car. Judge Wilner described the persuasive force that the deductive reasoning approach can generate:

*Mills* and *Ward* approached the nexus issue in terms of *pure deductive reasoning:* a particular kind of weapon was used in the crime; there was evidence linking the defendant to the crime; *the weapon was of a kind likely to be kept, and not disposed of, by the defendant; when arrested* shortly after the crime, *the defendant was not in direct possession of the weapon; ergo, it was likely to be found in a place accessible to him—his home or car.* That same kind of deductive approach, based on reasonable factual assumptions, has been used by a number of courts in finding a nexus between observed or documented drug transactions and the likelihood that drugs or other evidence of drug law violations may be found in the defendant's car or home. The reasoning, supported by both experience and logic, is that, *if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant, they are likely to be found in a place that is readily accessible to the defendant* but not accessible to others, *and that the defendant's home is such a place.*

*Direct evidence that contraband exists in the home is not required for a search warrant;* rather, *probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items.*

368 Md. at 521–22, 796 A.2d 90 (emphasis supplied).

The *Holmes* opinion then cited cases from nine federal Circuit Courts of Appeals as additional authority for the above stated principle. It concluded with the following reference to *United States v. Thomas,* 300 U.S.App.D.C. 380, 989 F.2d 1252, 1255 (D.C.Cir.1993):

The thrust of those decisions was characterized by the court in *Thomas*, in a unanimous *per curiam* opinion by a panel that included now Supreme Court Justice Ruth Bader Ginsburg, that *"observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence."*

368 Md. at 522, 796 A.2d 90 (emphasis supplied).

To be sure, the warrant application in *Holmes* did include two facts that the warrant application now before us does not. There was an observed drug transaction there less than a block away from the residence to be searched, and Holmes was also seen going in and out of the house just before the apparent drug transaction. That factor cannot be viewed with tunnel vision, however, although the defense seizes upon it as an arguable wedge of distinction. *Holmes* never remotely suggested that some direct observation was a *sine qua non* of establishing nexus.

Indeed, a fair reading of the *Holmes* opinion leaves no doubt that both its quantitative heft and its qualitative thrust lie in its endorsement of *Mills* and *Ward* and in its acceptance of their deductive reasoning approach that certain types of items will not be casually thrown away but will be hidden in predictable and accessible safe havens. Four full pages were spent discussing and analyzing that precept of both law and logic. 368 Md. at 520–24, 796 A.2d 90. A finding of nexus does not depend upon some direct observation of suspicious behavior in or near the residence. History cannot be rewritten to try to make the *Holmes* opinion stand for something that would actually be the very opposite of its dominant message.

### 2. *State v. Coley*

In *State v. Coley* a search warrant for Coley's residence had been issued and executed. At a suppression hearing, the circuit court excluded the evidence. On the State's appeal,

this Court reversed the suppression order. The suppression hearing judge in that case committed the same error that was committed in this case. He focused on probable cause *per se,* rather than on a substantial basis. Indeed, the suppression ruling had concluded:

> Is there probable cause for the defendant? Yes, there's probable cause to arrest the defendant, but *there's not probable cause to search the residence.* Accordingly *this court is going to grant the motion to suppress evidence seized at the residence* as it relates to this defendant.

145 Md.App. at 516, 805 A.2d 1186 (emphasis supplied).

In *Coley,* as in *Holmes,* there was also a direct observation involving the residence. "Coley was seen exiting his residence prior to both controlled buys." 145 Md.App. at 531, 805 A.2d 1186. As a result, it was unnecessary for *Coley* to state an affirmative rule that such an observation is only redundant and not legally required:

> As in *Holmes,* we do not "determine whether an isolated drug transaction, especially if it were to occur some considerable distance from the home, will suffice, because here there was additional evidence connecting the transaction to the home."

145 Md.App. at 531 n. 19, 805 A.2d 1186. The thrust of the opinion nonetheless was, as it was in *Holmes,* about the strength of deductive reasoning alone. The opinion analyzed at length, and with full approval, both *Mills v. State* and *State v. Ward* and the extensive analysis of those two cases engaged in by the *Holmes* opinion. 145 Md.App. at 525–26, 805 A.2d 1186.

For the deductive reasoning approach to be effective, however, it is necessary for the warrant application affirmatively to invoke it and to relate it to the circumstances of that particular case. It is not a Pavlovian reaction that springs automatically from the criminality of the suspect. Judge Kenney explained, 145 Md.App. at 527, 805 A.2d 1186:

The affiants needed only to show a reasonable basis to infer from the nature of the illegal activity that evidence of a crime would be found in Coley's residence.

In the *Coley* case, the warrant application did just that.

Trooper McClendon and Corporal McDonough stated that, in their experience, *persons engaged in drug law violations* in Prince George's County *are likely to store contraband and documents related to drug activity at their residences.* Deference is to be given to the experience of police officers.

145 Md.App. at 530–31, 805 A.2d 1186 (emphasis supplied).

The *Coley* opinion expressly pointed out that "even in the absence of direct evidence," the nexus could be established:

*The approach used by Maryland,* the U.S. Court of Appeals for the Fourth Circuit, and other jurisdictions *requires some nexus to be established, even in the absence of direct evidence,* between the nature of the items sought and the place where they are to be seized.

145 Md.App. at 527–28 n. 18, 805 A.2d 1186 (emphasis supplied). Our opinion quoted with approval from the opinion of the Fourth Circuit in *United States v. Williams,* 40 Fed.Appx. 843, 844 (4th Cir.2002):

"The nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."

*Id.* Judge Kenney concluded that the substantial basis test had been satisfied:

Taken as a whole, this search warrant application does not reflect "pure speculation." Indeed, *the affidavit provides a substantial basis for the issuing magistrate to believe that illegal narcotics activity was occurring in Coley's residence.* Here, as in *Holmes,* "at the very least, this would fall within the realm of a marginal case in which, under *Jones* and *Ventresca, deference must be given to the warrant."* The

issuance and execution of the search warrant involved here did not violate the Fourth Amendment . . .

145 Md.App. at 531, 805 A.2d 1186 (emphasis supplied).

### 3. *Mills v. State*

In both *Mills v. State* and *State v. Ward* there are no troubling additional and direct observations with respect to the residence to compromise the self-sufficiency of the deductive reasoning approach. In *Mills* the crimes being investigated were rape, armed robbery, and kidnapping. The evidence sought was a hunting knife that had been used in the perpetration of the crimes. There was no evidence dealing directly with Mills's residence for which the warrant was obtained. Mills challenged the proof of the nexus.

Mills argues that the affidavit used to obtain the search warrant "*is devoid of any facts* which tend *to show that the evidence sought was located in [his] home.*" . . .

. . . He argues, "the only basis for the conclusion that the knife was on the premises appears to be the fact that [Mills] was not carrying it when he was arrested."

278 Md. at 276–77, 363 A.2d 491 (emphasis supplied).

The Court of Appeals did not find that lack of direct evidence at all disturbing. After stating that "a number of decisions have upheld search warrants issued on facts comparable to those here and relying on similar inferences," Judge Smith's opinion went on to quote with approval from *United States v. Lucarz*, 430 F.2d 1051 (9th Cir.1970):

"The situation here does not differ markedly from other cases wherein *this court and others,* albeit usually without discussion, *have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation,* as in the normal search-and-seizure case, but *on the type of crime, the nature of the missing items,* the extent of the suspect's opportunity for concealment, *and normal inferences as to where a criminal would be likely to hide stolen property.*"

(Emphasis supplied). After citing extensive federal and state authorities, Judge Smith's opinion concluded:

> *Mills' home was a probable place for secreting objects such as a hunting knife and a sheath.* Accordingly, recognizing the preference to be accorded to search warrants, we find no error.

278 Md. at 280, 363 A.2d 491 (emphasis supplied).

### 4. *State v. Ward*

In *State v. Ward*, the crime was murder and the evidence being sought in the suspect's residence and car were the instrumentalities or other evidence of the murder. A search warrant was issued and the gun used in the murder was found in Ward's car. The trial judge denied the motion to suppress the gun, but the Court of Special Appeals reversed, holding that "the affidavit lacked information of nexus between the item sought and the place to be searched." 350 Md. at 375, 712 A.2d 534. Judge Rodowsky's opinion for the Court of Appeals reversed this Court and upheld the search warrant. The opinion summarized the warrant application:

> *The affidavit described Ward,* not in terms but in reasonable inference, *as a person to whom a handgun and ammunition are items of utility and value. Consequently, the magistrate could infer* a reasonable probability *that,* between the murder and the application for the warrant, *Ward had not disposed of the murder weapon and that Ward would be even less likely to have disposed of the weapon's less incriminating bullets.*

350 Md. at 377, 712 A.2d 534 (emphasis supplied). In upholding the search warrant, Judge Rodowsky relied on *Mills v. State* and on extensive state and federal authority supporting the position taken in *Mills*. He also quoted from 1 Wayne LaFave, *Search & Seizure* (1978), Sect. 3.7 at 709:

> "*Where the object of the search is a weapon used in the crime* . . . *the inference that the items are at the offender's residence is especially compelling,* at least in those cases

where the perpetrator is unaware that the victim has been able to identify him to the police."

350 Md. at 380, 712 A.2d 534 (emphasis supplied).

In *Holmes,* 368 Md. at 521, 796 A.2d 90, Judge Wilner succinctly described the Court's decision in *Ward:*

[W]e held that a neutral magistrate could reasonably con-clude that Ward was a person likely to possess a handgun and would not likely dispose of it. From the further facts that Ward did not have such a weapon on him when he was first arrested within 48 hours after the murder and that one was not seen in his car, we held that *a neutral magistrate could also reasonably infer that the weapon could be found either in his home or secreted in his car.* Relying on *Mills* and a number of out-of-State cases, we determined that the case was one of those "doubtful or marginal cases" ... that "should be largely determined by the preference to be accorded to warrants."

(Emphasis supplied).

### 5. *State v. Faulkner*

In *State v. Faulkner* a warrant had been issued for the search of two of Faulkner's residences, one business address, and two of his automobiles. The only issue on appeal was whether the warrant-issuing judge had had a substantial basis for finding a nexus between Faulkner's narcotics-related crim-inality and his residence at 5722 Plainfield Avenue in Balti-more City. The police surveillance simply showed that he went to Plainfield Avenue to sleep. The warrant application, how-ever, had also averred:

As a result of the extensive knowledge gained by training, conversations and the actual experience executing [narcot-ics-related] warrant[s] [and] arrests, your Affiant can make certain statements relating to methods ... narcotics traf-ficking. *Individuals involved in the narcotic[s] trade often use numerous different addresses to facilitate and aid in the furtherance of their illegal activity.* Official documents and various personal documents and identification.

190 Md.App. at 44, 985 A.2d 627 (emphasis in original). The application went on "to list various types of evidence often recovered from addresses used by narcotics traffickers, including narcotics, objects used for processing and storing narcotics, U.S. currency, documents and, firearms." *Id.*

At a suppression hearing, a circuit court judge granted a motion to suppress based on his conclusion that there had been no showing of a nexus. Our opinion summarized the suppression ruling:

> [T]he motion judge reasoned that there was nothing in the affidavit linking Faulkner's narcotics trafficking activities to the Plainfield Apartment, and therefore the warrant for that location was not issued upon probable cause. In particular, he commented that there is nothing unusual about a person's returning to his home at night. The judge observed: "There's just nothing to show the [Plainfield Apartment] was used for drug dealing, other than we can infer. Which the law says we can't do." Further, the motion judge found the affidavit so lacking in probable cause to search the Plainfield Apartment that the police could not have relied upon it in good faith. Accordingly, the court ordered the evidence seized from that location suppressed.

190 Md.App. at 45, 985 A.2d 627 (emphasis supplied).

After a thorough-going analysis of the at-times critical difference between a probable cause determination, on the one hand, and a substantial basis determination, on the other, Judge Deborah Eyler's opinion pointed out that the suppression hearing judge in that case, just as the suppression judge in this case, erroneously used the probable cause standard of review:

> The transcript of *the suppression hearing in the case at bar* reveals that *the motion judge was making his own de novo decision as to whether there was probable cause to believe there would be evidence of drug dealing in the Plainfield Apartment. "The court's responsibility,* however- er, *was not to assess* to its satisfaction *the existence of*

*probable cause, but,* rather, *to determine if the issuing magistrate's decision was supported by substantial evidence.''* Thus, the motion court erred in deciding the issue of probable cause *de novo.*

190 Md.App. at 48, 985 A.2d 627 (emphasis supplied).

At the outset, the State had acknowledged the challenge it was facing on the nexus issue.

The State implicitly acknowledges that *the affidavit contains no factual assertions directly linking Faulkner's criminal activity to the Plainfield Apartment.* It maintains, however, that the totality of the circumstances establish a "common sense nexus" between Faulkner's narcotics trafficking activities and that apartment.

*Id.* (emphasis supplied).

In a penetrating analysis of *Holmes v. State,* Judge Eyler pointed out how *Holmes* had rejected one extreme:

The *Holmes Court declined to hold,* as some courts have held, *that,* for a search warrant to issue for a suspect's home, *there must be direct, i.e.,* not inferential, *evidence linking the criminal acts to the home.*

190 Md.App. at 50–51, 985 A.2d 627 (emphasis supplied). She also pointed out how *Holmes* had similarly rejected the opposite extreme, the automatic inference of a nexus merely from the suspect's status as a drug dealer:

On the opposite end of the spectrum, *the Holmes Court likewise rejected the idea that* evidence of *a person's mere status as a drug dealer,* that is, that he is known to deal drugs, *can support a reasonable inference that he will have the tools or fruits of drug dealing in his home,* so as to support a finding of probable cause to search his home.

190 Md.App. at 51, 985 A.2d 627 (emphasis supplied).

The *Faulkner* opinion then characterized *Holmes* as having triangulated a middle position wherein, even in the absence of direct observations, the police, based on their experience and training, can articulate cogent reasons why they believe evidence will be found in the residence.

*The Holmes Court adopted a middle ground* that probable cause to search a suspect's home can be found when there is a nexus between the suspect's criminal actions and his home sufficient to support a reasonable inference that the tools or fruits of the crime probably will be found at his home. *It reasoned by analogy to Mills v. State and State v. Ward, which involved search warrants for weapons in the defendants' homes.* The defendants in those two cases were arrested away from their homes for crimes in which particular weapons were used, and were not in possession of the weapons when arrested. In upholding the warrants, *the Court in both cases employed what it later characterized in Holmes as "pure deductive reasoning" to draw a reasonable inference that the weapons would be found in the homes:*

[A] particular kind of weapon was used in the crime; there was evidence linking the defendant to the crime; *the weapon was of a kind likely to be kept, and not disposed of, by the defendant; when arrested shortly after the crime, the defendant was not in direct possession of the weapon; ergo, it was likely to be found in a place accessible to him—his home or car.*

190 Md.App. at 52, 985 A.2d 627 (emphasis supplied).

Judge Eyler then surveyed opinions from seven United States Circuit Courts of Appeals holding that a reasonable deductive predicate was an adequate basis for establishing the nexus between a criminal and his residence. *United States v. Feliz,* 182 F.3d 82, 88 (1st Cir.1999) ("not unreasonable ... to have relied upon her common sense ... that [the suspect] would be likely to keep proceeds from his drug trafficking and records relating to drug transactions at his apartment."); *United States v. Cruz,* 785 F.2d 399 (2d Cir.1986) (holding probable cause to search drug dealer's apartment despite lack of evidence that suspect had ever used the apartment); *United States v. Hodge,* 246 F.3d 301, 306 (3d Cir.2001) (stating that it was reasonable to infer that suspect caught on the street would keep evidence in his home); *United States v. Grossman,* 400 F.3d 212, 218 (4th Cir.2005) ("reasonable to suspect that a drug dealer stores drugs in a home to which he

owns a key"); *United States v. McClellan,* 165 F.3d 535, 546 (7th Cir.1999) ("magistrate is entitled to draw reasonable inference . . . that in the case of drug dealers evidence is likely to be found where the dealers live"); *United States v. Pitts,* 6 F.3d 1366, 1369 (9th Cir.1993) ("A reasonable nexus does not require direct evidence that the items listed as the objects of the search are on the premises to be searched."); *United States v. Thomas,* 989 F.2d 1252, 1255 (D.C.Cir.1993).

Even without the extra indications that had been present in *Holmes* and *Coley,* this Court held that nexus in *Faulkner* had been adequately established:

> To be sure, *the linkage* between the Plainfield Apartment and Faulkner's drug selling activities *is not as close in location or time* as the linkages between the defendants' drug selling activities and their houses in *Holmes* and *Coley. The nexus is there, however.*

190 Md.App. at 60, 985 A.2d 627 (emphasis supplied).

Judge Eyler's analysis stressed the final point that even if the case were a "close call" on probable cause *per se,* it was not a close call on the very different issue of substantial basis:

> *Even if this case were a "close call" on probable cause, however, our task is not to decide probable cause but instead to decide whether there was a substantial basis* for the issuing court's probable cause finding; and in doing so, *we are to resolve a marginal case with preference to the warrant.* We hold that the issuing judge had a substantial basis for finding probable cause to search the Plainfield Apartment.

*Id.* (emphasis supplied). Our concern is not with probable cause *per se.*

### 6. *Behrel v. State*

The very apotheosis of the *Mills–Ward–Holmes–Coley–Faulkner* line of analysis is *Behrel v. State, supra.* The challenged search warrant in that case was issued on February 2, 2001 for the search of 302 Buckingham Drive in Grayslake, Illinois, a suburb of Chicago. No criminal activity

or even suspicious activity of any sort was ever observed occurring in or near the Illinois residence. Indeed, no suspicious behavior was ever observed within 631 miles of the Illinois residence.

What was observed in Hagerstown, Maryland, a full 16 to 20 years before the 2001 issuing of the warrant was the behavior of the sexually abusive Episcopal priest in taking from and then returning to a locked footlocker in his campus apartment pornographic material, including video movies, sexual aids, and pictures of the teenaged sexual abuse victims. Critical to the 2001 warrant application was the following allegation:

> Trooper Potter has learned through his training that sexual offenders tend to keep mementos of prior acts along with pictures and videos.

In the 2001 search in Illinois, both the footlocker and the pornographic materials it contained were seized by the police. Behrel sought the suppression of the evidence on the grounds that the probable cause was stale and that there was no nexus between the criminal behavior in Maryland 16 to 20 years earlier and the residence in Illinois. In holding that there had been a substantial basis for the issuance of the search warrant, Judge Hollander concluded:

> Potter indicated that, based on his training, he knew "that *sexual offenders tend to keep mementos of prior acts along with pictures and videos.*" As noted, both victims indicated that appellant used the footlocker for that purpose. *The issuing judge was entitled to conclude from the affidavit that a person charged with the sexual abuse and exploitation of children would be likely to retain pornographic material and lewd photographs indefinitely.*
>
> Considering the nature of the items sought and the experience of Potter, we are satisfied that the finding of probable cause was not erroneously based on stale information.

151 Md.App. at 96–97, 823 A.2d 696 (emphasis supplied). See also *State v. Kirsch,* 139 N.H. 647, 662 A.2d 937 (1995); *People v. Russo,* 439 Mich. 584, 487 N.W.2d 698 (1992); *State v.*

*Woodcock,* 407 N.W.2d 603 (Iowa 1987); *State v. Jannetta,* 355 N.W.2d 189 (Minn.Ct.App.1984); *Gregg v. State,* 844 P.2d 867, 873 (Okla.Crim.App.1992); *State v. Jones,* 299 N.C. 298, 261 S.E.2d 860 (1980).

The likelihood that certain types of property will be retained by a suspect for extended periods of time does not depend upon the observation of suspicious activity in or near the suspect's residence.

## Nexus Is Exclusively A Federal Constitutional Question

The decisions of the United States Courts of Appeals that we have cited are, of course, not authoritatively binding. They are persuasively important, however, because the nexus issue is, in the last analysis, a federal constitutional issue. It is a part of Fourth Amendment law. Its only significance is because of the impact it might have on the suppression of evidence. Nexus is a factor in evaluating probable cause. Probable cause is a factor in evaluating the reasonableness of a search or seizure. The reasonableness of the search or seizure is a factor in deciding whether to exclude evidence.

The whole suppression phenomenon, moreover, is exclusively a federal constitutional question. The only instrumentality of suppression is the Exclusionary Rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which is available only for violations of the federal Fourth Amendment. Maryland has no exclusionary rule of its own. Any independent Maryland law on the issue of proving a nexus between a suspect's street criminality and a suspect's home or car would be, therefore, "much ado about nothing."

## A Substantial Basis For a Ruling on Nexus

The controversy over nexus in this case is exclusively a controversy over what the law requires by way of proof of nexus. The defense argues that nexus may not, as a matter of law, be established in the absence of some direct observations linking the evidence sought to the place to be searched. Although it is a stretch to invoke *Agurs v. State* for such a

purpose, the defense may at least plausibly strain in that direction.

The decision of the warrant-issuing judge and the position of the State on this appeal are that the warrant application was not bereft of evidence of nexus. It did not rely on any notion of an automatic nexus but gave thoroughly articulated reasons for the deductive inference that evidence would be found in Frisby's home or automobiles. The body of case law establishing that such an evidentiary basis can suffice to establish nexus consists of *Mills v. State, State v. Ward, Holmes v. State, State v. Coley, State v. Faulkner, Behrel v. State,* and no less than seven United States Courts of Appeals.

Whatever some interpretation of nexus law might someday speculatively become, it is inconceivable that one could today argue that the warrant-issuing judge in this case did not have a substantial basis for relying upon this solid block of case law, affirmed and reaffirmed five times over the course of 36 years, not to mention the array of approval from seven United States Courts of Appeals. To hold otherwise would be to repudiate everything the Supreme Court has been saying for 50 years about deferring to the warrant-issuing judge, about the "preference for warrants," and about the "presumptive validity of warrants." The warrant-issuing judge in this case had a substantial basis for issuing the warrant and the evidence, therefore, should not have been suppressed.

### The Evaporation Rate of Probable Cause

The appellee stubbornly continues to argue, as he did at the suppression hearing, that the probable cause offered by the State was stale. This argument, however, is not properly before us. Even in otherwise ruling in the appellee's favor, the suppression hearing judge found, as a matter of fact, that the State's probable cause was not stale. The State has not taken an appeal from that finding, and this is, after all, the State's appeal. The appellee, for his part, has filed no cross-appeal from that finding of non-staleness. The issue is simply not before us.

Even if, purely *arguendo,* the issue of staleness were before us, however, the appellee would find no balm in Gilead. In the first place, the appellee continues to argue as if the existence of probable cause were the critical issue before us. It is not. Our concern is not with probable cause, but only with the question of whether the warrant-issuing judge had a substantial basis for issuing the warrant. In a close case, the fact that the probable cause might be found by a reviewing court to be stale would not *ipso facto* necessitate a ruling that the warrant-issuing judge had lacked a substantial basis for issuing the warrant. Staleness is a highly subjective factual question that different judges could answer in different ways, and reviewing judges are required to be highly deferential to the warrant-issuing judge and to eschew *de novo* determinations of their own. Every defect in probable cause does not necessarily invalidate the substantial basis predicate and staleness, as but one of such possible defects, is no exception.

Even on the hypothetical merits of the staleness of probable cause question, the appellee would fare no better. The prevailing analysis as to the evaporation rate of probable cause was made by this Court in *Andresen v. State,* 24 Md.App. 128, 172, 331 A.2d 78 (1975):

> The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in the ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

That verbatim analysis has not only been quoted with approval but has been expressly adopted by the Court of Appeals consistently over the intervening 37 years. *Peterson v. State,* 281 Md. 309, 316–17, 379 A.2d 164 (1977); *Connelly v. State,* 322 Md. 719, 733–34, 589 A.2d 958 (1991); *Greenstreet v. State,* 392 Md. 652, 674–75, 898 A.2d 961 (2006) ("The Court of Special Appeals explained the general rule of stale probable cause in *Andresen v. State,* ... which we adopted in *Peterson.*"); *Patterson v. State,* 401 Md. 76, 92–93, 930 A.2d 348 (2007).

Applying the *Andresen* criteria to the case at hand, we have 1) in Tavon Frisby a criminal who is "entrenched" in the only home he, as a teenager, knows and is not "nomadic"; 2) "thing[s] to be seized" (a gun and indicia of gang membership) that are not "perishable and easily transferable" but are rather "of enduring utility to its holder"; and 3) a "place to be searched" that is for this teenaged resident no "mere criminal forum of convenience" but rather his "secure operational base." The likelihood that Frisby is securing such items, like the weapons in *Mills v. State* and *State v. Ward,* in his home had not gone stale.

The perfect exemplar for *Andresen's* statement that the "observation of the burial of a corpse in a cellar may well not be stale three decades later" is Judge Hollander's opinion for this Court in *Behrel v. State, supra.* In *Behrel,* the observation by an abused teenager in Hagerstown in the early 1980s of pornographic materials in the abuser's footlocker was not stale when it was used to justify a search of the abuser's home in a suburb of Chicago between 16 and 20 years later. There are certain items that a suspect is likely to keep in a place accessible to him even years after their initial observation.

### An Unadorned Conditional Holding

Even if, *arguendo,* everything we have said thus far were wrong, it is too clear to be seriously controverted that pursuant to the "good faith" exception of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the officers in this case were entitled to rely upon the judicially issued

warrant and the evidence should not have been suppressed for that reason alone. We so hold. We decline to divert attention from our core holding by offering any further justification for something so clear that it needs no justification.

**SUPPRESSION RULING REVERSED AND CASE REMANDED FOR TRIAL; COSTS TO BE PAID BY APPELLEE.**