REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 2117
September Term, 2015

_____

DEON LEROY WILLIAMS

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Wright,
Alpert, Paul E.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Alpert, J.
_____

Filed:  December 2, 2016

Deon Leroy Williams, appellant, was convicted by a jury sitting in the Circuit Court for Caroline County of three counts of possession with intent to distribute a controlled dangerous substance (heroin, hydrocodone, and marijuana); three counts of possessing each of those drugs; and six counts of possession of a firearm by a convicted felon.[1] Appellant raises four questions on appeal, which we have slightly reworded:

> I.    Did the suppression court err in denying appellant's motion to suppress the drugs and guns seized from his residence?
>
> II.   Did the trial court err when it refused to accept defense counsel's offer to stipulate to appellant's prior disqualifying conviction?
>
> III.  Did the trial court err by failing to take any action when the defense informed the court that a juror had repeatedly fallen asleep?
>
> IV.  Did the trial court err when it denied appellant's motion for judgment of acquittal on all charges?

For the reasons that follow, we shall affirm the judgments.

## BACKGROUND FACTS

On the evening of September 17, 2013, Sergeant Leonard Nichols[2], an 11-year veteran with the Maryland State Police, the last five years with the Caroline County Drug

---

[1] The court sentenced appellant to a total of 30 years of imprisonment:  15 years for possession with intent to distribute heroin; 15 years for possession with intent to distribute hydrocodone; five years for possession with intent to distribute marijuana; and 15 years for each possession of a firearm conviction.  All sentences are to be served concurrently, except for one of appellant's possession of a firearm convictions, which is to be served consecutively.  Appellant's remaining simple possession convictions were merged for sentencing purposes.

[2] At the time of the incident, Sergeant Nichols's rank was corporal.  By the time of the hearing, however, he had been promoted to the rank of sergeant, and that is how we shall refer to him.

Task Force, executed a traffic stop of appellant for driving on a suspended and revoked driver's license in the Easton area of Talbot County. The sergeant had been told earlier by a confidential informant that appellant would have drugs on him. Pursuant to a search incident to arrest, however, no drugs were found on appellant or in his car, although he had a large sum of cash ($1,356) on his person and he was nervous. Appellant was transported to the police barracks in Easton in Talbot County where he was strip searched and a baggie was seen protruding from his anus. Pursuant to a search warrant, the baggie was removed by medical personnel. The baggie contained two additional baggies: one contained heroin, the other contained cocaine.

The sergeant then obtained and, about four hours later, during the early morning hours of September 18, executed a second search warrant for appellant's residence at 7188 American Corner Road in Denton, in Caroline County. From the residence, the police seized drugs (heroin, hydrocodone and marijuana) and six guns -- three handguns and three rifles. Appellant was subsequently charged in Caroline County with six drug counts and six gun counts relating to the seizure of the items from his residence.

### SUPPRESSION HEARING FACTS

Prior to trial on those charges, appellant sought to suppress the drugs and guns recovered pursuant to the Caroline County residential search warrant. In his written motions, appellant argued that the events in Talbot County were illegal and poisoned the search and seizure warrant issued for his residence in Caroline County – the traffic stop was invalid because it was pretextual, and the cavity search and the manner in which it was conducted were illegal. In a written response, the State argued that any issues concerning

2

the initial vehicle stop and subsequent cavity search had already been heard and decided in the State's favor in appellant's Talbot County case.[3]

At the subsequent suppression hearing, the State again raised the same argument – that the Talbot County Circuit Court had already determined that the initial vehicular stop, arrest, and subsequent cavity search were valid. Defense counsel seemed to agree but also argued, indistinctly, "something [] survived from Talbot County." After some discussion, the suppression court stated that while there was no *res judicata* or collateral estoppel in this case, the issue before it was "very limited" -- whether there was a substantial basis for the Caroline County magistrate to issue the warrant for appellant's residence. The State then presented the testimony of Sergeant Nichols and admitted into evidence the 24-page affidavit in support of the residential search warrant. Appellant testified in support of his motion.

Sergeant Nichols testified that around 6:30 p.m., on September 17, 2013, he received a telephone call from a confidential informant (CI#3) about appellant. During the

---

[3] Appellant was charged with drug offenses in Talbot County based on the drugs recovered pursuant to the cavity search. Prior to trial, appellant moved to suppress those drugs, which after a hearing the suppression court denied on April 29, 2015. Appellant subsequently entered a guilty plea on June 22, 2015. He later filed an application for leave to appeal, which was denied on October 29, 2015.

Although the State's argument has superficial appeal, it is wrong. *See Scott v. State*, 379 Md. 170, 183 (2004)(stating that a decision by one circuit court judge is not binding on another circuit court judge because the two judges are "'colleague[s] of coordinate jurisdiction.'")(quoting *Stewart v. State*, 319 Md. 81, 91 (1990)). *Cf. Gertz v. Anne Arundel County*, 339 Md. 261, 273 (1995)("[A]s a general principle, one judge of a trial court ruling on a matter is not bound by the prior ruling in the same case by another judge of the court; the second judge, in his discretion, may ordinarily consider the matter de novo.")(quotation marks and citation omitted). The State does not raise this argument on appeal.

3

telephone call, the informant told the sergeant that appellant was attending a "Narcotics Anonymous . . . or some kind of meeting," and that when he left the meeting he would enter a described car that was parked behind the Wal-Mart on Teal Drive in Easton. Appellant would leave the area in the car and make drug "drops" – selling specified amounts of drugs to individuals. After the sergeant received the call, he learned and confirmed through dispatch that appellant's license had been suspended and revoked.

The sergeant and his partner set up a surveillance of the area, and a short time later appellant was observed leaving the area in the described vehicle. The sergeant followed appellant's car for about a ¼ of mile when the sergeant, who had prior contact with appellant, believed that appellant had spotted him. Appellant pulled into a parking lot and stopped. The sergeant pulled his car next to appellant's car and likewise stopped. The sergeant arrested appellant for driving on a suspended and revoked license.

Pursuant to a search incident to arrest, the sergeant searched appellant and his car but found nothing of note, except $1,356 on appellant's person. During the search, the sergeant noted that appellant was cooperative but nervous – his chest was rapidly "moving up and down," the muscles in his neck "were visibly contracting," and he was sweating, even though the temperature was a mild 75 degrees. The sergeant testified that he believed "criminal activity was afoot" based on his prior contact with appellant, the information from CI#3, the large sum of cash, and appellant's nervousness. The sergeant had appellant transported to the Easton Barrack where he could be processed for driving on a suspended and revoked license and strip searched.

4

Appellant was taken to the "intoximeter room" – a multipurpose room of the Easton Barrack where DUI's and fingerprints are processed, and a "secure" area of the barrack where the public is not allowed. Appellant, the sergeant and two, possibly three, other officers were present in the room. Appellant was asked to take off his clothes, turn around, bend over, and spread his buttocks apart. According to the sergeant, appellant did as he was instructed, except he did not spread his buttocks so the sergeant could see appellant's anus clearly. Nonetheless, the sergeant did see a plastic baggie protruding from appellant's rectal area. The sergeant "tried" to spread appellant's buttocks apart to retrieve the baggie but could not because appellant "clench[ed]" his muscles. When the sergeant tried to handcuff appellant, a scuffle ensued between appellant and the officers. Once appellant had been handcuffed, the sergeant told appellant what he had seen but appellant refused to retrieve the baggie himself. The sergeant left appellant naked in the room for about an hour while he applied for and received a search warrant for medical personnel to remove the baggie from appellant's anus. Appellant was then taken to a hospital where, around 12:50 a.m., a doctor physically removed from appellant's anus a plastic baggie containing what was later determined to be a baggie of heroin and a baggie of crack cocaine.

Sergeant Nichols then applied for a search warrant for appellant's residence at 7188 American Corner in Denton in Caroline County. Appellant had listed that address with the Motor Vehicle Administration, the Maryland Sex Offender Registry, and during a prior traffic stop and a prior arrest. In the application in support of the search warrant for the American Corner residence, the sergeant provided the following information:

5

- Since 2002, the Caroline County Drug Task Force had received information that appellant was distributing drugs in and around Caroline County, and since 2011, information concerning his drug distribution had "increased substantially."

- In July 2011, a confidential informant made a controlled purchase of heroin from appellant in Caroline County. Appellant was arrested and pursuant to a search warrant, no drugs were found on appellant's person. Appellant is a registered sex offender and his address is listed as 7188 American Corner Road.

- Appellant is currently compliant with his sex offender registry, which still lists his address as 7188 American Corner Road. Sergeant Nichols confirmed with the officer responsible for tracking sex offenders that during several home visits at that address appellant had been present each time.

- At the end of May 2012, a confidential informant (CI#1) told members of the Caroline County Drug Task Force that on May 29, 2012, appellant had traveled to Annapolis to purchase heroin in a gold-colored four-door sedan with Maryland registration 99476Z. Sergeant Nichols had observed appellant operating a gold-colored Mercedes Benz with that license plate during that time.

- In January 2013, Sergeant Nichols arrested a person for heroin distribution. The person told Sergeant Nichols that appellant supplied him/her with heroin and that appellant was "very cautious about his business and would never meet new persons." The person stated that he/she had "never been allowed to go to [appellant's] residence to meet him[.]" The person added that appellant got his supply of heroin from Annapolis, and that appellant took a different driver and car each time he went to Annapolis.

- On February 13, 2013, the police performed a traffic stop of a vehicle occupied by appellant, Byron Drummond, and another. Sergeant Nichols came upon the traffic stop to assist. The police had information that the occupants were in possession of drugs. A K-9 scan of the car resulted in a positive alert, but a manual search of the car and the occupants uncovered no drugs. Appellant had approximately $1,000 on his person as did the female occupant. Appellant stated during the traffic stop that his home address was the American Corner address.

- A week later, on February 20, Sergeant Nichols arrested appellant for an "outstanding parole retake warrant." Pursuant to a search incident to an arrest, Sergeant Nichols recovered a straw from appellant's pants pocket and a folded dollar bill from his car, each of which contained suspected Oxycodone residue. Appellant was charged with possession of paraphernalia.

- On July 23, 2013, a confidential informant (CI#2) told the Caroline County Drug Task Force that he/she had been buying heroin from appellant, that he/she never met appellant at his residence, and that appellant always told him/her to meet on a back road (Clark Road) in Denton.

- On August 6, 2013, an anonymous confidential informant (CI#3) called Sergeant Nichols and told him that appellant was the "largest" heroin supplier in Caroline County; that appellant got his heroin from Annapolis; that Drummond sometimes drove appellant to Annapolis; that appellant often uses different cars; that appellant lives at 7188 American Corner Road; and that he is usually home during the day and leaves during the night and early morning to distribute heroin.

- On that same day, another confidential informant (CI#4) contacted a member of the Caroline County Drug Task Force and said that appellant was selling heroin around Caroline County, that he drove a green Ford F-150, and that the informant had purchased heroin from appellant on a back road (Clark Road) in Denton.

- On August 9, 2013, an anonymous source contacted a member of the task force and said that appellant was selling "large amounts" of heroin in the Denton and Ridgely areas of Caroline County; that he lives with his father on American Corner Road; that appellant sets up his girlfriend, Becca Hutson, in a hotel in Denton to sell heroin for him; and that appellant drives a white Cadillac. During this time a member of the task force observed Hutson exit a Best Western Hotel in Denton and meet appellant, who was driving a white Cadillac.

- On August 15, 2013, Sergeant Nichols, who had been in daily contact by cell phone with CI#3, spoke to CI#3 who said that appellant was in the Ridgely area, that he/she had witnessed appellant make two hand-to-hand transactions, and that appellant was sitting in a white Cadillac parked in front of an apartment complex. Sergeant Nichols went to the area to verify the information but by the time he arrived, he only observed appellant leaving the area in a white Cadillac.

7

- On August 20, 2013, Sergeant Nichols was involved in the traffic stop of a car driven by Hutson in which appellant was a passenger. The car, however, did not stop immediately and a plastic bag was seen being tossed from the passenger side of the car before the car stopped. A K-9 positively alerted to the car. A search of the car and the area where the bag was tossed yielded negative results. Appellant was searched but no drugs were recovered, although appellant had over $1,000, mostly in $20 denominations, on his person. Appellant again provided the American Corner address as his home address.

- On September 17, 2013, Sergeant Nichols received information from CI#3 that appellant would be attending "drug classes" in a building behind the Easton Wal-Mart, that he would be driving a purple Jetta, and that he would be in possession of drugs. Sergeant Nichols set up a surveillance of the area, saw appellant enter a purple Jetta that the sergeant then followed. The sergeant stopped the vehicle and arrested appellant for driving on a revoked license. Appellant and his car was searched but only $1,356 was recovered from appellant's person. Appellant was taken to the Easton Barrack for processing and strip searched. Appellant was told to turn around, bend over, and spread his "butt cheeks." When appellant did so, Sergeant Nichols observed a plastic baggie containing an off-white brown substance protruding from appellant's anus. The sergeant was unable to retrieve the baggie because appellant clenched his buttock muscles. The sergeant obtained a search and seizure body cavity warrant, which was executed at a local hospital. A baggie, containing two additional baggies of heroin and crack cocaine, was removed from appellant's anus.

The application also stated that CI #1, #2, and #3, who were unaware that the others were providing information to the police about appellant, had provided information on other unrelated subjects that had been true and accurate and had never provided false or misleading information. Additionally, Sergeant Nichols averred in the application that he knew, through his training and experience, that drug dealers often will not sell directly from their residence or the place they stash their supply and proceeds so as to insulate themselves from police, rival drug dealers, and customers. The affidavit also listed appellant's criminal history: November 23, 2005, arrest in Easton for manufacture/distribute CDS;

8

November 4, 2005, arrest in Wicomico for possession of marijuana and paraphernalia; February 27, 2003, arrest in Denton for disorderly conduct, and obstruct and hinder; October 9, 2001, arrest in Easton for possession of marijuana and paraphernalia; and June 5, 2001, arrest in Berlin for possession of CDS not-marijuana, possession of paraphernalia, and handgun in a vehicle.

The search warrant for appellant's residence was granted at 3:25 a.m., and executed about an hour later. The house was unoccupied and the officers made a forced entry. The sergeant testified that he believed that he had authority to execute the warrant. Drugs and firearms were recovered from the house.

Appellant testified at the suppression hearing in support of his motion. He testified about the experience of the strip search. He testified that following his arrest, he was taken to the Easton Barrack where he was told to remove his clothes. Four other officers were in the room, and they stared at him. He testified that he did initially spread his butt cheeks when asked, but when asked to do so again, he said no. At that point, officers grabbed his arms and "they" started "digging in my buttocks." Appellant resisted. He testified that the house on American Corner belonged to his father, and although it was "technically" his address and he "occasionally" stayed there, he "normally" stayed at his girlfriend's home.

At the conclusion of the testimony, defense counsel argued, among other things, that the traffic stop turned into an impermissible cavity search. The State disagreed. After hearing both parties' arguments, the suppression court denied appellant's motion to suppress. The court found the sergeant's testimony "to be credible[.]" The court found the stop and arrest valid. The court found the initial search of appellant and the car as a

9

valid search incident to arrest. The court then stated that as part of the processing for the arrest, a strip search was performed. The court did not specifically state whether the strip search was legal but in conclusion stated that the issuing magistrate in Caroline County had a substantial basis to believe that items of illegality would be found at appellant's residence.

## I.

Appellant argues that the suppression court erred in denying his motion to suppress the items seized pursuant to the execution of the residential search warrant. He argues that the strip search was illegal because the police did not have reasonable articulable suspicion to believe that he had secreted drugs in his anal cavity and the manner in which the search was conducted was unreasonable. He argues that when the tainted strip search evidence (the drugs) is excluded from the residential warrant, the warrant lacks probable cause to support the search of his home. He argues that the good faith exception to the exclusionary rule does not apply because "no reasonably well-trained police officer could have relied on the warrant[.]" The State responds that neither the strip search nor the manner of the strip search were illegal, but even if they were, the good faith exception to the exclusionary rule applies. Therefore, the suppression court did not err in denying appellant's motion to suppress.

### A. Was the strip search legal?

To answer the question presented on appeal, we must first untangle and wade through several different legal theories. We shall begin with the law regarding search warrants and work our way to the legality of the strip search.

10

When confronted with whether a search warrant is legal, the question before us ordinarily is "whether the issuing judge had a substantial basis to conclude that the warrant was supported by probable cause." *Greenstreet v. State*, 392 Md. 652, 667 (2006)(citation omitted). To determine whether the issuing judge had a "substantial basis," we do not apply "a *de novo* standard of review, but rather a deferential one." *Id.* We apply a deferential standard because of the preference for search warrants.

> Because a search warrant provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime, we have expressed a strong preference for warrants and declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall. Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination.

*Id.* at 668 (quoting *United States v. Leon*, 468 U.S. 897, 913-14 (1984))(quotation marks omitted). The different tasks of an issuing court and a reviewing court in this context have been explained as follows:

> The task of the issuing judge is to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability that contraband or evidence of a crime will be found in a particular search. *Illinois v. Gates*, 462 U.S. 213, 238–39 . . . (1983). The duty of a reviewing court is to ensure that the issuing judge had a "substantial basis for . . . conclud[ing] that probable cause existed." *Id.* . . . The U.S. Supreme Court explained in *Gates* that the purpose of this standard of review is to encourage the police to submit to the warrant process. *Gates*, 462 U.S. at 237 n. 10[.]

*Id.* at 667–68 (some citations omitted).

11

When we review the basis of the issuing judge's probable cause finding, we ordinarily apply the "four corners rule" and "confine our consideration of probable cause solely to the information provided in the warrant and its accompanying application documents." *Id*. at 669 (citations omitted). There are limited circumstances when we deviate from the rule and look to evidence outside of the warrant and its affidavit. Those circumstances occur when a defendant makes a required showing for a *Franks* hearing[4] or where the warrant is undecipherable. *Id*. at 669. Additionally, "evidence derived as a result of a prior illegal search or seizure, or knowledge gained through such a search and seizure, cannot be used as a valid basis to justify the existence of probable cause in a subsequent application for a search and seizure warrant." *Everhart v. State*, 274 Md. 459, 481 (1975)(citations omitted). *See also Carter v. State*, 274 Md. 411, 438-39 (1975)(any information gathered from an earlier illegality cannot be exploited and used as derivative evidence in an application for a search and seizure warrant). To do otherwise "would permit the prosecution to use knowledge acquired in violation of the Fourth Amendment and 'gained by its own wrong.'" *Id*. at 439. The *Everhart* court explained:

> The doctrine of the "fruit of the poisonous tree" extends the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search; in its broadest sense it prohibits the prosecution from using in any manner, prejudicial to the accused, information derived from facts learned as a result of the unlawful acts of law enforcement agents. Once a defendant, with requisite standing, has timely and factually asserted that the challenged evidence was derived from information obtained in an unlawful search and seizure, the court must afford

[4] *Franks v. Delaware*, 438 U.S. 154 (1978)(permitting the admission of extraneous evidence where a defendant shows that the affiant has perjured himself on a material matter).

12

him an opportunity to explore in detail the circumstances under which the evidence was acquired; if the defendant establishes that the evidence resulted from an unlawful search and seizure such evidence cannot be used at all unless the prosecution can convince the trial court that it had an independent origin or that the information gained in the unlawful search did not lead directly or indirectly to the discovery of the challenged evidence.

*Id*. at 481–82 (citations omitted).

Having set out the law regarding search warrants, we now turn to the legality of the strip search.

There are at least three categories[5] of a strip search:

A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to a visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Paulino v. State*, 399 Md. 341, 352 (quotation marks and citations omitted), *cert. denied*, 552 U.S. 1071 (2007). A visual body cavity search "does not involve the police probing into such a cavity." *State v. Harding*, 196 Md. App. 384, 412 (2010), *cert. denied*, 418 Md. 398, *cert. denied*, 132 S.Ct. 118 (2011). However, if an investigator attempts to retrieve a plastic baggy seen protruding from the anus or if an investigator attempts to spread "the cheeks of a recalcitrant searchee's buttocks[,]" who "stubbornly refuses to perform that operation for himself[,]" the search is still a visual body cavity search because the seizure is "simply a permissible seizure under the Plain View Doctrine." *Id*. at 412-14.

---

[5] In *State v. Harding*, 196 Md. App. 384, 408-09 (2010), we suggested that the Court of Appeals in *Paulino v. State*, 399 Md. 341, 352, created a fourth category of strip search – a "reach-in" search. We need not address this fourth category because this is clearly not a "reach-in" case.

*Cf. Paulino*, 399 Md. at 353-54 (where officer manipulated the accused's buttocks to allow for a better view of his anal cavity and in doing so observed a plastic bag containing drugs, the conduct amounted to a visual body cavity search)(footnotes omitted).  In contrast, a manual body cavity search generally involves the intrusion of the anal or vaginal cavity and should be "normally entrusted only to a gynecologist or proctologist" because of hygienic and medical concerns.  *Harding*, 196 Md. App. at 414-15.  Here, a visual body cavity search occurred.

When a person has been arrested for a minor traffic offense unrelated to any drugs, and a search incident to arrest balloons into a strip search, to determine whether the strip search was legal we look to the four-factor balancing test set forth in *Bell v. Wolfish*, 441 U.S. 520, 589 (1979).  *Paulino*, 399 Md. at 354-55.  The four factors include:  "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Id.* at 355 (quotation marks and citations omitted).  We take a "flexible approach" in balancing the four factors, "one that takes into account the relative strength of each factor" and "balance[s] the need for a particular search against the invasion of personal rights that the search entails."  *Id.* (quotation marks and citations omitted).

As to the first factor, we agree with appellant that a visual body cavity search by its nature is intrusive and demeaning.  *See Paulino*, 399 Md. at 356 ("searches that entail the inspection of the anal and/or genital areas have been accurately described as demeaning, dehumanizing, undignified, humiliating, embarrassing, repulsive, degrading, and

14

extremely intrusive of one's personal privacy")(quotation marks, brackets, and citation omitted).

We shall address together the second factor (the manner in which the search was conducted) and the closely associated fourth factor (the place where it was conducted). Appellant argues that the search was not conducted in a reasonable manner because the barrack room was not "suitably private": he was forced to disrobe in front of several officers; the officers engaged in physical force when they grabbed and bent him over the counter and dug into his buttocks resulting in the sergeant's hand going into his anus; and he had to sit naked for the hour it took the sergeant to obtain a warrant to have medical personnel intervene.

Although the suppression court recounted little detail in its fact finding concerning the strip search, we defer to the suppression court's fact finding that the sergeant's testimony was credible and that "[a]t a point where the officer or trooper asked the Defendant to spread his buttocks, the officer saw what he believed to be a foreign substance." Additionally, we note that although there were four officers present, the search took place in a secure area of a police barrack, not a public area. Under the circumstances presented, we believe that the manner and place where the search took place was reasonable. *Cf. Moore v. State*, 195 Md. App. 695, 719 (2010)(upholding visual body cavity search conducted in private room at the police station in the presence of two male officers), *cert. denied*, 418 Md. 192 (2011), and *Paulino*, 399 Md. at 360 (invalidating visual body cavity search conducted in a well-lit area at night near a car wash in public view).

15

Turning to the third factor, we are persuaded that the strip search was justified – that there was "a particularized reasonable belief that evidence of the crime [would] be found on (or in) the body of the suspect." *Harding*, 196 Md. App. at 421. *See also State v. Nieves*, 383 Md. 573, 595-96 (2004)(in determining whether the strip search was justified, we ask whether the police had reasonable articulable suspicion to believe that evidence of criminal activity would be found in the place searched). We shall briefly relate the law concerning reasonable articulable suspicion.

We are mindful that the concept of reasonable articulable suspicion is not governed by a particular test but is "purposefully [] fluid because . . . [it] is not readily, or even usefully, reduced to a neat set of legal rules." *Holt v. State*, 435 Md. 443, 459 (2013)(quotation marks and citations omitted). Reasonable articulable suspicion has been described as "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id*. (quoting *Illinois v. Wardlow*, 528 U.S. 119, 128 (2000)). It has also been described as a "'common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act.'" *Id*. at 460 (quoting *Crosby v. State,* 408 Md. 490, 507 (2009))(quotation marks and citation omitted). The required level of suspicion is less demanding than that for probable cause, but "nevertheless embraces something more than an 'inchoate and unparticularized suspicion or hunch.'" *Id*. (quotation marks and citations omitted).

In determining whether an officer has a particularized and objective basis for suspecting illegal wrongdoing, we look to the "totality of the circumstances" of each case. *Id*. This process involves "two interdependent analytical techniques[.]" *Id*.

16

First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations . . . and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person. . . . The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, [392 U.S. 1 (1968)] . . . , said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."

*Id.* at 460-61 (quotation marks and citations omitted). According to *Holt*:

We therefore assess the evidence through the prism of an experienced law enforcement officer, and "give due deference to the training and experience of the . . . officer who engaged the stop at issue." *Crosby*, 408 Md. at 508 . . . *Cartnail* [*v. State*], 359 Md. [272] at 288 [(2000)] . . . (quoting [*U.S. v.*] *Cortez*, 449 U.S. [411] at 418, [(1981)](noting that the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement"). We, of course, recognize that the deference we afford police officers is not without limits. We do not "rubber stamp conduct simply because [an] officer believed he had the right to engage in it" and "there must be an articulated logic to which this Court can defer." *Crosby,* 408 Md. at 509[.]

*Id*. at 461 (some quotation marks and citations omitted).

In determining whether the strip search here was justified, we find the analysis in *Harding*, *supra*, and *Nieves*, *supra*, informative. In *Harding*, Harding was strip searched following an arrest for possession of drugs. We were asked to decide on appeal whether the strip search was justified, specifically, whether there was reasonable articulable suspicion to believe that drugs would be found in or on Harding's person. In that case, in September 2009, a detective in the Vice and Narcotics Section of the Baltimore County Police Department received information from a "'very reliable informant,'" whom the

17

police had used for five to six months and who had provided reliable information in other cases that had led to numerous CDS arrests and search warrants, that Harding was selling crack cocaine from a blue Audi in the Towson area. *Harding*, 196 Md. App. at 436. A detective in the same unit had received a complaint two to three months earlier that Harding was selling crack at a liquor store. We noted on appeal that both complaints identified Harding as a seller not a user, a factor in deciding whether there was reasonable articulable suspicion to believe that Harding was hiding his "stash on or in the body." *Id*. at 436.

Eight days after the September information, the police observed Harding driving the described Audi in a Towson neighborhood, and subsequently stopped him for traveling 50 miles per hour in a 35 mile per hour zone. *Id*. at 389, 436. As part of the routine traffic stop, a K-9 unit was called and twice, positively alerted to the presence of drugs in the car. *Id*. at 390. Although no drugs were found in the car or on Harding's person, the police recovered $1,474 in cash from Harding's pockets. *Id*. at 395. Based on his training and experience that persons in possession of drugs will often secrete or conceal drugs on their body, the detective had Harding transported to a police station to insure maximum privacy during the strip search. *Id*. at 396, 437. As Harding removed his pants, a baggie of crack cocaine dropped out of the pants and fell to the floor. *Id*. We found that the positive dog alert furnished probable cause for Harding's subsequent arrest and subsequent strip search. *Id*. Accordingly, we stated that that under the circumstances presented, "[w]e have no difficulty in holding that the particularized suspicion standard for a strip search was satisfied in this case." *Id*. at 435. *See also Fontaine v. State*, 135 Md. App. 471, 475-82 (2000)(we held a strip search was justified and reasonable where accused, who was arrested

18

for driving on a suspended license, was fidgeting and attempted to place an object in his pants during the police encounter, during a search of the vehicle trace amounts of marijuana were found throughout the vehicle, and the police had prior information that the accused normally concealed contraband in his pants).

In *Nieves*, the Court of Appeals found a strip search of Nieves unreasonable following his arrest for a minor traffic violation (driving without a valid driver's license) where the only particularized belief for the strip search was that Nieves had prior drug arrests and, at the time of his arrest on the traffic violation, he was driving the truck of a missing female who had a history of drug involvement. *Nieves*, 383 Md. at 596-98.

Turning to the facts of our case, we are persuaded that Sergeant Nichols had reasonable articulable suspicion to justify the strip search. The sergeant, who the suppression court found credible, testified that he believed criminal activity was afoot and decided to strip search appellant based on appellant's nervousness, the large sum of cash found on his person, the information from the CI#3, and his prior contact with appellant.

Evidence of appellant's demeanor (sweating even though the day was temperate, heavy breathing, and bulging neck muscles) while not sufficient in itself is but one reed on which the sergeant could rely in finding reasonable articulable suspicion. *See State v. Darden*, 93 Md. App. 373, 345, *cert. denied*, 328 Md. 447 (1992), *cert. denied*, 508 U.S. 957 (1993)(evidence that the accused was "shaking" and "sweating profusely" when stopped by the police is important in a reasonable articulable suspicion analysis, but by itself is "too slender a reed" to support reasonable articulable suspicion for investigatory stop of accused by police). Likewise, the sergeant's recovery of a large sum of cash from

appellant's person pursuant to a search incident to arrest, is not sufficient by itself but one reed on which the sergeant could rely in forming reasonable articulable suspicion.

Although the sergeant did not testify at the suppression hearing about any specific prior contact he had with appellant, the State argues that we should consider the "substantial information known to Sergeant Nichols at the time of the arrest" as found in the warrant application. We agree that in the unusual circumstances presented we can rely on the sergeant's contact and extensive knowledge about appellant at the time he arrested him as related in the application in support of the search warrant. This is because the sergeant was the directing officer of the arrest and strip search as well as the affiant on the residential search warrant which was admitted into evidence. We can clearly impute to the sergeant at the time of the strip search those items listed in the search warrant of which the sergeant had direct or personal knowledge. We further note that only a few hours elapsed between when the strip search occurred and the residential search warrant was obtained, and all of the information related in the warrant application was known before the strip search occurred.[6]

---

[6] The State goes further and suggests that we can rely not just on the information known to the sergeant based on his personal experience, but on all the information stated in the application for the residential search warrant. The State does not provide any law to support its argument but presumably, the State is relying on the doctrine of "collective knowledge." *See Ott v. State*, 325 Md. 206, 215 ("In Maryland, probable cause may be based on information within the collective knowledge of the police.")(citations omitted), *cert. denied*, 506 U.S. 904 (1992), and *Johnson v. State*, 238 Md. 528, 539, (1965)("Information placed on a look-out prepared by a police organization, of which the arresting officer is a part, may constitute probable cause for the arrest.")(citation omitted), *abrogated on other grounds by Galloway v. State*, 371 Md. 379, 408-10, 416 (2002). Because we are persuaded that the sergeant had reasonable articulable suspicion to order
(continued)

20

The warrant application provided information about the sergeant's personal contact with appellant. Specifically, several months before the strip search, the sergeant arrested a person for drug-related crimes and that person informed the sergeant that appellant supplied him with heroin, and that appellant was very cautious about his business. A month later, the sergeant was involved in a traffic stop of appellant and Drummond and another where the officers had been tipped off that occupants were in possession of drugs. Although a K-9 made a positive alert for drugs, and all three occupants were nervous and had over $1,000 in cash on them each, a search incident to arrest produced no drugs. A week later, the sergeant arrested appellant on an outstanding warrant, and pursuant to a search incident to arrest found a straw and folded dollar bill that contained suspected Oxycodone residue on them. Less than a month before the strip search, the sergeant caused appellant's car to be stopped during which a plastic bag was thrown out of the passenger side. Again, a K-9 made a positive alert on the car but a search of the vehicle yielded negative results as did a search of the area where the plastic bag was thrown.

Additionally, little more than a month before the strip search, the sergeant was contacted by CI#3 and remained in daily contact with him up until the time of appellant's arrest. CI#3 told the sergeant that appellant was "the largest source" of heroin supplied in Caroline County and confirmed that Drummond was involved in appellant's drug dealing activities. A week or so later, CI#3 contacted the sergeant and stated that he had observed

_____

(continued)
the strip search based, in part, on the direct and personal information he had regarding appellant as found in the warrant application, we need not look to the other information included in the application.

21

appellant make two hand-to-hand drug transactions in a described area and was now sitting in a described car. When the sergeant arrived, appellant was seen leaving the area in the described car.

The facts of this case are much closer to *Harding*, *supra*, than to *Nieves*, *supra*. At the time of the arrest, appellant was nervous and had a large sum of cash on his person. The sergeant had extensive knowledge of appellant and his drug dealing: he had information from two sources that appellant sold heroin; the sergeant was involved in two recent traffic stops of appellant where a K-9 had given positive alerts but no drugs were found; and the sergeant had recently discovered drug paraphernalia on appellant's person. Additionally, CI#3, whom the sergeant had been working with, and had daily contact with for over a month, informed the sergeant that appellant would be making drug drops upon leaving a certain area at a certain time. When we take into consideration the modes or patterns of certain kinds of drug dealings, and weighing all the information as understood by someone versed in law enforcement, we are persuaded that this is not a situation where the sergeant had an "unparticularized suspicion or hunch" but where the sergeant had reasonable articulable suspicion to justify the strip search.

Weighing the *Bell v. Wolfish*, *supra*, factors, three of the factors weigh in favor of the State – the manner in which the search was conducted, where the search was conducted, and that the search was justified – and only one factor -- the intrusiveness of the search – weighs in favor of appellant. Taking into account the relative strength of each factor and balancing the need to ferret out crime against the invasion of personal rights, we are persuaded that the strip search here was reasonable and legal.

22

**B. Did the issuing magistrate for the residential search warrant have
a substantial basis to believe that evidence of drug dealing would
be found in appellant's residence?**

Appellant argues that even if we hold that the strip search was legal, the search warrant for his residence failed to establish probable cause. Specifically, appellant argues that none of the information in the search warrant application alleged that he was dealing drugs from his residence nor was there any drug activity reported at or near his residence. Citing *Agurs v. State*, 415 Md. 62 (2010), appellant argues that the warrant failed to establish a nexus between his drug dealing and his home in Denton. The State argues that with or without evidence of the drugs recovered during the strip search the issuing magistrate had a substantial basis for issuing the residential warrant.

Although some jurisdictions hold that there is probable cause to believe that drug dealers keep drugs and records of their drug trade in their homes, Maryland appellate courts have "explicitly rejected this notion" and require some nexus "between the nature of the items sought and the place where they are to be seized." *State v. Coley*, 145 Md. App. 502, 527-28 n.18 (2002)(citations omitted). In *Agurs*, the Court of Appeals spoke extensively about the nexus requirement and the quantity and quality of criminal activity to support probable cause to search a home. The Court stated:

> Direct evidence that contraband exists in the home is not required for a search warrant; rather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items. The thrust of [cases stating this rule] was characterized by the court in [*United States v. Thomas*, 989 F.2d 1252, 1255 (D.C.Cir.1993)], in a unanimous *per curiam* opinion by a panel that included now Supreme Court Justice Ruth Bader Ginsburg, that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause

23

to issue a search warrant for the residence, *if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence.*"

* * *

[T]he mere observation, documentation, or suspicion of a defendant's participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found in the home. There must be something more that, directly or by reasonable inference, will allow a neutral magistrate to determine that the contraband may be found in the home.

*Agurs*, 415 Md. at 85 (quoting *Holmes v. State*, 368 Md. 506, 522-23 (2002)).

We find the analysis in *Holmes* and *Agurs* instructive. In *Holmes*, the Court of Appeals upheld a search warrant and concluded that a nexus existed between Holmes's alleged drug activity and his home because the police had observed Holmes in a drug transaction less than a block from his home; Holmes had a history of controlled dangerous substance violations; was seen frequently entering and exiting his home around the time of the drug transaction; and the police discovered drugs and money on him before they conducted the search of the house by warrant. *Holmes*, 368 Md. at 523.

In *Agurs*, the Court of Appeals concluded that a nexus did not exist between Agurs and his home to support the search warrant executed on his home. The search warrant included information that: multiple confidential informants advised the police that Agurs and associates were upper level crack cocaine distributors in certain described areas of Baltimore City; an informant told the police that appellant was supplying suspected cocaine around the area and told the police where appellant worked; a confidential informant made two controlled buys of cocaine from someone with whom Agurs associated; that appellant

24

was seen walking into a clothing store with an unknown male who left the store about a minute later with a "bulge" in his right pocket; Agurs's criminal history for drugs (20 year and 15 year old drug-related convictions and some older and newer non-drug related convictions); and that appellant seemed to be living beyond his means based on the value of homes and vehicles belonging to him. *Agurs*, 415 Md. at 70-72, 94-99.

*Mills v. State*, 278 Md. 262 (1976), and *State v. Ward*, 350 Md. 372 (1998), are also instructive. In *Mills*, the police sought a hunting knife that had been used in several crimes the police were investigating -- rape, armed robbery, and kidnapping. There was no evidence pointing to Mills' residence, for which a search warrant was obtained, as the place where the knife would be found. In *Ward*, the police were investigating a murder and the search warrant sought the gun used in the murder from Ward's vehicle and residence. Again, there was no evidence pointing to Ward's residence or vehicle as the place where the gun would be found. The *Holmes* Court wrote about the reasoning it applied in *Mills* and *Ward*, where it upheld the validity of the search warrants:

> *Mills* and *Ward* approached the nexus issue in terms of pure deductive reasoning: a particular kind of weapon was used in the crime; there was evidence linking the defendant to the crime; the weapon was of a kind likely to be kept, and not disposed of, by the defendant; when arrested shortly after the crime, the defendant was not in direct possession of the weapon; *ergo,* it was likely to be found in a place accessible to him - his home or car. That same kind of deductive approach, based on reasonable factual assumptions, has been used by a number of courts in finding a nexus between observed or documented drug transactions and the likelihood that drugs or other evidence of drug law violations may be found in the defendant's car or home. The reasoning, supported by both experience and logic, is that, if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant, they

25

are likely to be found in a place that is readily accessible to the defendant but not accessible to others, and that the defendant's home is such a place.

*Holmes*, 368 Md. at 521–22.

The deductive reasoning approach is applicable here. First, there was significant information that appellant was involved in drug dealing. The affidavit in support of the search warrant related information from several confidential informants and anonymous sources regarding appellant and his drug dealing. *See State v. Jenkins*, 178 Md. App. 156, 185-86 (2008)(discussing the increased credibility of information from a "known" informant who is working with the police and for whom the police vouch, as compared to an anonymous tipster). Their information corroborated each other, in part, and was, in part, corroborated by the police. Appellant was found in possession of drugs a few hours before the search warrant was obtained. Additionally, the warrant application listed appellant's several prior arrests and drug violations. *See id.* at 187 (a criminal record has significance when assessing probable cause); *West v. State*, 137 Md. App. 314, 350-51, *cert. denied*, 364 Md. 536 (2001)(numerous arrests within ten years of the issuance of the warrant are relevant to the probable cause determination); *State v. Amerman*, 84 Md. App. 461, 484-85 (1990)(noting that United States Supreme Court has made clear that prior arrests, convictions, and prior criminal reputation may be significant factors in a probable cause determination)(citations omitted).

Second, there was sufficient evidence of a nexus between appellant's criminal activity and his residence. CI#3 told the sergeant that appellant is at the American Corner address during the day and leaves there to distribute heroin during the night/early morning

26

hours. An anonymous source, corroborated by CI#2, told the sergeant that he/she has never purchased heroin from appellant at his residence, and both CI#2 and CI#4, independently, told the sergeant that they met appellant, not at his house, but on the same back road to purchase heroin. Additionally, the sergeant stated in the application that he knew, through his training and experience, that drug dealers often do not sell directly from where they reside or where they keep their drug supplies to protect themselves from detection by the police, rival drug dealers, and customers. Thus, there was information offered that appellant used his home as a "stash house" where he stored, but did not sell drugs.

*Agurs* is distinguishable from our facts for two reasons. First, unlike *Agurs*, the police here had direct evidence of appellant's involvement in drugs – drugs were found on appellant pursuant to the strip search just a few hours before the residential search warrant was obtained. Second, unlike *Agurs*, the sergeant averred in the warrant application that, based on his extensive training and experience, drug dealers often keep their stash at their residence but do not sell drugs from their house to protect their stash from the police and others. Under the circumstances presented, we are persuaded that a sufficient nexus existed to support a finding that the magistrate had a substantial basis to believe that the warrant contained probable cause. *Cf. State v. Johnson*, 208 Md. App. 573, 599-618 (2012) (discussing several nexus cases including the anti-nexus case of *Agurs* and the pro-nexus cases of *Mills* and *Ward*).

### C. Good Faith Exception

Even if we believed that the magistrate lacked a substantial basis for issuing the warrant, we would find that the good faith exception to the exclusionary rule applies.

27

Appellant argues that the exception should not apply because "no reasonably well-trained police officer could have relied on the warrant that authorized the search of the home[.]"

The significant costs of the exclusionary rule has made it applicable only "where its deterrence benefits outweigh its substantial social costs." *State v. Savage*, 170 Md. App. 149, 202 (2006)(quotation marks and citation omitted). Thus, the exclusionary rule has its limitations, for it is seen as a remedy of "last resort, not our first impulse[.]" *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The United States Supreme Court has articulated the following exceptions to the exclusionary rule: 1) the independent source doctrine, which allows for the admission of evidence obtained in an unlawful search if the police officers independently acquired it from a separate, independent source; 2) the inevitable discovery doctrine, which allows for the admission of evidence that would have been discovered even without the unconstitutional source; and 3) the attenuation doctrine, which allows for the admission of evidence when the connection between unconstitutional police conduct and the evidence (either direct or derivative) is remote or has been interrupted by some intervening circumstance. *Williams v. State*, 372 Md. 386, 409-11 (2002)(quotation marks and citations omitted).

In *United States v. Leon*, 468 U.S. 897, 904 (1984), the United States Supreme Court established another limitation on the exclusionary rule -- the good faith exception. In *Leon*, the Court concluded "that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. The reasoning behind the good faith exception is "[b]ecause the only purpose of the Exclusionary Rule . . . is to

deter unreasonable police behavior . . . a mistake made by a judge in issuing a warrant should not be attributed to the police officer who executes it." *State v. Andrews*, 227 Md. App. 350, 418 (2016)(quotation marks and citations omitted). Thus, the good faith exception seeks to avoid "[p]enalizing the officer for the magistrate's error, rather than his own[.]" *Leon*, 468 U.S. at 921 (footnote omitted).

*Leon* set out only four circumstances under which the good faith exception to the exclusionary rule would not apply:

> (1)when the judicial officer issuing the warrant was misled by an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) when the magistrate wholly abandoned his judicial role; (3) when a warrant [is] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when the warrant is facially deficient (*e.g.,* failing to particularize the place to be searched).

*State v. Faulkner*, 190 Md. App. 37, 61 (2010)(quotation marks, citations, and footnote omitted). Appellant argues that the third circumstance applies here. We disagree.

The third circumstance, which is frequently invoked but rarely applied, was "clearly intended to deal with a purely conclusory statement in a warrant application backed up by no further supporting data" – a so-called "bare-bones" affidavit. *Jenkins*, 178 Md. App. at 202-03. We gave the following two examples of so-called "bare-bones" affidavits: "Affiants have received reliable information from a credible person and do believe" that certain narcotics will be found on the described premises, and the "[Affiant] has cause to suspect and does believe that" certain described merchandise is contained on the described premises. *Id.* This is certainly not the case here. Information from several confidential informants and anonymous sources was related in great detail and corroborated, in part, by

the police. Additionally, Sergeant Nichols related in detail his own experiences and prior contact with appellant as well as other members of the drug task force unit. Therefore, even if there was not a substantial basis for a magistrate to have issued the residential search warrant, we would apply the good faith exception, and not suppress the evidence recovered from appellant's residence, as appellant would have us do.

**II.**

Citing *Carter v. State*, 374 Md. 693 (2003), appellant argues that we must reverse all his convictions because the trial court erred in refusing to accept his offer to stipulate to his disqualifying conviction for the firearm offenses – a prior conviction for distributing drugs. The State concedes that under *Carter* the trial court should have accepted the defense's offer to stipulate so as not to disclose the nature of that conviction to the jury, but nonetheless, the State argues reversal is unwarranted because appellant did not object when the prior conviction was admitted later at trial. We agree with the State.

As related above, appellant was charged with six counts of possession of a regulated firearm by a disqualified person. Appellant was alleged to be a disqualified person because of a prior drug distribution conviction. S*ee* Md. Code (2003, 2011 Repl. Vol., 2015 Suppl.), Public Safety Article § 5-133(c)(1)(ii).

After the testimony of Sergeant Nichols, the State moved to admit into evidence a "true test copy" of appellant's prior drug distribution conviction. To avoid having the nature of his prior conviction presented to the jury, defense counsel offered to stipulate that appellant had a previous conviction that prevented him from possessing firearms. After some discussion, the trial court refused to do so, agreeing with the State that according to

30

the charging document and the law, the State was required to prove that appellant had a prior "drug-related conviction" to sustain the firearm possession charges. Defense counsel responded that it would not object to amending the charging document to reflect that appellant had a "disqualifying condition" to possessing firearms. The court held to its ruling, responding that it could not make the State "amend anything[.]"

The State then sought to introduce the prior conviction into evidence. When defense counsel objected, the court responded: "It will be admitted over objection. I realize that your objection is to the prejudicial value outweighs the probative of it, but it is an element of the last six offenses . . . the firearms charges, so it is an element that the State has introduced with a certified copy of the record." The court then admitted the exhibit.[7]

The State rested and appellant took the stand in his defense. During cross-examination, the following colloquy occurred:

> [THE STATE]: Okay. You're the same Deon Williams that was convicted of controlled dangerous substance manufacture, distribution of narcotic in April of 2006?
>
> [WITNESS]: Yep.
>
> [THE STATE]: And you're the same Deon Leroy Williams who was convicted of the failure to register as a sex offender in January of 2006?
>
> [WITNESS]: Yep.

After appellant's testimony, the court instructed the jury, without objection:

> You've heard evidence that the [d]efendant has been convicted of a crime. You may consider this evidence in deciding whether the [d]efendant is telling the truth, but for no other purpose. You must not consider the conviction as evidence that the [d]efendant committed the crime charged in this case. Now

---

[7] The exhibit was not included in the record.

31

you've heard evidence also that the [d]efendant has been convicted of a crime that would make illegal for him to possess certain firearms. You may consider that evidence in deciding whether he has possessed firearms with having had a disqualifying crime that is a felony.

Following the initial jury instructions, the trial court supplemented its instructions, without objection, as follows:

You've also heard evidence that the [d]efendant in this case previously committed the crime of possession with intent to distribute a controlled dangerous substance on April the 18th, 2006. That is not a charge in this case. You may consider this evidence only on the question of motive, intent and as a disqualifying crime for the possession of a regulated or unregulated firearm. However, you may not consider this evidence for any other purpose, specifically you may not consider it as evidence that the [d]efendant is in bad character or has a tendency to commit crime.

The Court of Appeals in *Carter*, *supra*, held, that when an accused in a criminal-in-possession case requests that the name or nature of the previous conviction not be disclosed to the jury, "the trial court must accept a stipulation or admission that the defendant was convicted of a crime that qualifies under the criminal-in-possession statute." 374 Md. at 720 (footnote omitted). The Court explained that "the trial judge should inform the jury that the defendant admits that he or she has been convicted of a crime for which he or she is prohibited from possessing a regulated firearm under the law." *Id*. at 722. The Court reasoned that "[t]he judge should not describe the previous conviction with any more particularity or by using the categories of crimes . . . such as 'crime of violence' or 'felony'" because "[a] description of the conviction by its statutory category carries with it a high potential to lure jurors 'into a sequence of bad character reasoning[.]'" *Id*. The Court recognized that "as a matter of law, the probative value of the name or nature of a previous conviction is substantially outweighed by the danger of undue prejudice[.]" *Id*. at 722 n.10.

32

Md. Rule 4-323(a) provides: "An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." "[I]t is not reversible error when evidence, claimed to be inadmissible, is later admitted without objection." *Tichnell v. State*, 287 Md. 695, 716 (1980)(citations omitted). *See Williams v. State*, 131 Md. App. 1, 17, *cert. denied*, 359 Md. 335 (2000)(evidence coming in either earlier or later without objection waives admission of evidence), and *Clark v. State*, 97 Md. App. 381, 394-95 (1993)(even though defense objected at times to certain testimony, failure to object both before and after elicitation of the same testimony waived objection for appeal). By not objecting later when the same conviction was entered into evidence, appellant has waived any objection to the contested evidence.

### III.

Appellant argues that he is entitled to a new trial because the trial court failed to take any action when he brought to the court's attention that a juror had allegedly nodded off during trial. The State argues that the trial court did not abuse its discretion in not granting appellant's requested recess, and reversal is unwarranted because appellant has failed to show any resulting prejudice from the juror's alleged inattentiveness. We agree with the State.

"It is well-settled that trial courts are vested with broad discretion in the conduct of trials." *State v. Booze*, 334 Md. 64, 68 (1994)(citations omitted). *See also Churchfield v. State*, 137 Md. App. 668, 682, *cert. denied*, 364 Md. 536 (2001)(same). Md. Rule 4–312(g)(3) provides that in all non-capital cases "[a]t any time before the jury retires to

33

consider its verdict, the trial judge may replace any jury member whom the trial judge finds to be unable or disqualified to perform jury service with an alternate[.]" *See also* George L. Blum, Annotation, *Inattention of Juror from Sleepiness or Other Cause as Ground for Reversal or New Trial*, 59 A.L.R. 5th 1 (1998).  Likewise, the substitution of an alternate juror for a regular juror "lies within the sound discretion of the trial judge [and s]uch an exercise of discretion will not be disturbed on appeal unless arbitrary and abusive in its application." *James v. State*, 14 Md. App. 689, 699 (1972).  We have said that an abuse of discretion occurs where "no reasonable person would take the view adopted by the [trial] court."  *Fontaine v. State*, 134 Md. App. 275, 288, *cert. denied*, 362 Md. 188 (2000)(quotation marks and citations omitted)(brackets in original).  "Thus, where a trial court's ruling is reasonable, even if we believe it might have gone the other way, we will not disturb it on appeal." *Id.*

Here, after the jury was sworn in and before opening statement, the trial court told the jury panel that during trial it would "take periodic recesses."  The trial court advised the panel:

> I usually take a ten minute recess about every hour.  However, if anyone needs a recess, if anyone needs to take a break, raise your hand and I'll declare a recess right then, even if it's in the middle of somebody's testimony.  Don't be bashful, raise your hand.  I'll understand.  And I'll declare a recess right there.  Or you can tell your Forelady you want a recess and she'll tell me, she'll get my attention.  The mind, I believe, can only absorb what the bottom can endure, so I will try to take a break every hour, but please feel free to say you need a recess or indicate that and I'll see to it that you get a recess.

After opening statement, the court took a 25 minute recess.  The State then called its only witness, Sergeant Nichols.  After 65-pages of written transcript, a bench conference

34

ensued.  Because of the need to address other unrelated matters, the court dismissed the jury for an hour and a half, and then told them to report back at 5:30 p.m.  At that time, court reconvened and the State continued with its direct examination of Sergeant Nichols for about 20-pages of written transcript.

Shortly after defense counsel began its cross-examination of Sergeant Nichols, the parties approached the bench to discuss an unrelated evidentiary issue.  During the bench conference, defense counsel advised the trial court that appellant had told him that "one of the jurors in the front row" had twice fallen asleep.  The trial court stated, "I haven't seen it[.]"  The court added:  "I'm not going to admonish him.  I haven't seen him nod off."  Defense counsel stated, "All right.  Okay[.]"  Appellant then asked the court to give "a break" to the allegedly nodding-off juror.  The State advised that Sergeant Nichols was its last witness, and the court noted that "[w]e just got back in here."  The court denied appellant's request but advised that it would "keep an eye on" the juror.

Defense counsel continued cross-examination of Sergeant Nichols for 30-pages of transcript, the State re-directed for about 10-pages of typed transcript, and defense counsel re-crossed for one page.  At an ensuing bench conference during another unrelated evidentiary matter, defense counsel told the court, "[W]e have noticed the juror nodding off several more times."  The trial court replied, "Okay.  Well I've been watching him.  I haven't seen him nod off."  Appellant replied, "He's been asleep the whole time."  Defense counsel requested no relief.  The parties returned to their trial tables, and the State rested.  The jury was given a recess while the parties and the court dealt with other matters,

35

including defense counsel's motion for judgment of acquittal. The jury was recalled and defense counsel proceeded with its case and the "nodding" juror was not mentioned again.

We have found three Maryland cases dealing with sleeping jurors, and although none of them are factually on point, they do provide a context for our decision.

In *Hall v. State*, 223 Md. 158 (1960), Hall alleged to the trial court that three jurors appeared to be asleep and a newspaper reporter stated that "it appeared that one of the jurors was sleeping." *Hall*, 223 Md. at 177. In contrast were the statements from the three jurors involved, all of whom denied sleeping or being inattentive, and a statement from the State's Attorney that "he did not notice any inattentiveness on the part of the jury." *Id.* at 178. On appeal, the Court held that a party alleging juror misconduct is required to prove that the misconduct actually occurred and that the party was prejudiced by the misconduct. The Court found no conclusive proof that the jurors were asleep. Additionally, appellant failed to show any prejudice, noting that "[t]he length of time the juror was asleep is not shown, nor does it appear what testimony was introduced during that time, nor that it was of any importance or extent, nor whether favorable or unfavorable to the accused." *Id.* (quotations and citation omitted). The Court concluded: "Without stronger evidence that the misconduct alleged actually occurred, and a showing of prejudice to the appellant, we cannot say that there are grounds for reversal." *Id.*

In *Stokes v. State*, 72 Md. App. 673 (1987), a trial court *sua sponte* substituted an alternate juror for a designated juror whom the court believed was sleeping. Stokes's attorney disputed the trial court's observations and strongly objected to the court's action. On appeal, we held that the trial court's action was in error as there was no evidence that

the juror was unable to continue and because of the criminal justice system's strong policy to keep empaneled juries intact. *Id.* at 680-84. In *Wright v. State*, 24 Md. App. 309, 313 (1975), we held the trial court did not err in not granting Wright's motion for a new trial where there was no evidence of prejudice when the foreman that had dozed off was awakened immediately upon dozing and had been attentive both before and after the incident.

Here, appellant believed that a juror was nodding off and brought this to the trial court's attention. The trial court disagreed, stating that it had not seen the juror nod off but advising that it would keep an eye on the juror. Defense counsel responded, "Okay." We are aware of no law, and appellant directs us to none, that requires a trial court to *sua sponte* inquire into whether a juror had been sleeping when the trial court's own observations are to the contrary. Even if the evidence supported the conclusion that the juror was inattentive or sleeping, appellant did not show that he was prejudiced. There was no evidence about the length of time that the juror was asleep, what testimony was being introduced during that time, or whether such testimony was of any importance or favorable or unfavorable to appellant. Without such evidence, as in *Hall*, we find no error.

**IV.**

Appellant was convicted of three counts of possession with intent to distribute CDS (heroin, hydrocodone, and marijuana); three counts of possessing each of those drugs; and six counts of possession of a firearm by a convicted felon. Appellant argues that the evidence was insufficient to support his convictions because the State "utterly failed to prove that [appellant] possessed any of the drugs or guns[.]" To support his argument,

37

appellant downplays the significance of the "single piece of mail" addressed to him and found in the bedroom where the drugs and guns were recovered. He also emphasizes his testimony that his deceased brother used that bedroom and that several others lived in the home with appellant. The State responds that the evidence was more than sufficient to support a rational inference that appellant was in possession of the drugs and guns found at the residence. We agree with the State.

When reviewing the sufficiency of the evidence, our task is to determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Hobby v. State*, 436 Md. 526, 537-38 (2014)(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))(emphasis in *Jackson*). This standard applies regardless of whether the verdict rests upon circumstantial or direct evidence "since, generally, proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *State v. Suddith*, 379 Md. 425, 430 (2004)(quotation marks and citation omitted). "[R]esolving conflicts in the evidence, and weighing the credibility of witnesses, is properly reserved for the fact finder." *Longshore v. State*, 399 Md. 486, 499-500 (2007)(citations omitted). A jury is given the responsibility to "choose among differing inferences that might possibly be made from a factual situation and [a reviewing court] must give deference to all reasonable inferences the fact-finder draws, regardless of whether we would have chosen a different reasonable inference." *Suddith*, 379 Md. at 430 (quotation marks and citations omitted).

38

For purposes of drugs offenses, "possess" is defined by statute as the "exercise [of] actual or constructive dominion or control over a thing by one or more persons." Md. Code Ann., Criminal Law § 5-101(v). "Control" is defined as "the exercise of a restraining or directing influence over the thing allegedly possessed." *Handy v. State*, 175 Md. App. 538, 563 (quotation marks and citations omitted), *cert. denied*, 402 Md. 353 (2007). Control may be actual or constructive, joint or individual. *Id.* "[K]nowledge of the presence of an object is generally a prerequisite to the exercise of dominion and control." *Id.* (citation omitted). The definition and contours of possession in drug cases applies equally to firearm possession cases. *Id.* at 564.

At trial, the State's only witness was Sergeant Nichols with the Maryland State Police, currently assigned to the Caroline County Drug Task Force. He was admitted as an expert in the field of narcotics evaluation, identification, and detection, particularly as to heroin, opiates, synthetic opiates, and marijuana. Appellant, his father, his mother, and his brother testified for the defense.

Sergeant Nichols testified similar to his suppression hearing testimony regarding the arrest of appellant and subsequent search of his person and his car, adding that the police recovered $1,356 and two cell phones from appellant's person and three cell phones from appellant's car. The sergeant also testified that after his arrest, appellant was transported to the Maryland State Police Barrack in Easton where he was strip searched. A plastic baggie corner, tied at the top and containing CDS, was removed from appellant's anus. The sergeant further testified that the Maryland Motor Vehicle Administration listed

appellant's address as 7188 American Corner Road, Denton, Maryland, 21629, and that appellant gave that address in his daughter's child support case.

Pursuant to the execution of a search and seizure warrant for 7188 American Corner Road, the police recovered guns and drugs from the back bedroom of the residence. Specifically, the police found inside the closet two handguns and three handgun magazines. On top of the bed under the sheets was a third handgun. Of the three .22 caliber long rifles recovered, two were found in a gun case behind the closet door and the third was found on the floor behind the bed. A plastic baggie containing buprenorphine and five loose hydrocodone pills were found on the dresser. At the foot of the bed, the police recovered a plastic baggie of marijuana. From that spot, the police also recovered a letter postdated July 31, 2013, from the Maryland Department of Health and Mental Hygiene addressed to appellant at the address. Adult male clothing and hats, several boxes of ammunition, and $488 in $5 and $1 denominations were also found in the back bedroom. The police also recovered numerous plastic baggies with both corners missing, and the corners of plastic baggies on the back porch and in a container in the dining room. These baggies were similar in nature to the one removed from appellant's anus.

Sergeant Nichols testified that after the search and seizure of the residence, he obtained a search and seizure warrant for the two cell phones seized from appellant's person. Several texts from those cell phones were admitted into evidence. Specifically, on August 13, 2013, an unknown caller texted appellant: "Could you please help me out with those subs we talked about. I really want to kick but I get so sick I want to die. OMG. I can't be in bed ill like that. I need to take care of my family and work. Please my phone

messed up, but you can call me on my daughter phone. Thanks." The sergeant explained that "subs" meant Suboxone, an opiate blocker that is used by a person to stop an opiate addiction. On September 10, 2013, an unknown caller twice texted appellant: "[C]all me bro nd a huge favor" and "My peoples nd a g and a half[.]" The sergeant explained that "a g and a half" meant a gram and a half of a controlled dangerous substance.

Appellant's father testified that he has rented the American Corner residence since 2000, and that appellant and others stayed at the house. He testified that appellant sometimes stayed at the house, and when he did, he slept on the couch in the living room. Appellant's mother testified that appellant stayed at the house in September 2013, but that he slept in the living room or another bedroom. She testified that appellant did not stay in the back bedroom where the drugs and guns were found but that "[e]verybody, random people" stayed in that bedroom. Appellant's brother, with whom appellant was currently housed in the same cell and correctional facility for a 2015 conviction for possession of CDS with the intent to distribute, testified that in September 2013, their oldest brother, Vernel, who had died earlier that year, routinely used the bedroom where the guns and drugs were found. The State, however, admitted evidence that Vernel lived elsewhere at the time.

Appellant testified in his defense. He testified that although the American Corner Road address was his legal address, he spent most of his time at his daughter's mother's residence. He testified that when he stayed at the American Corner house he never slept in the back bedroom, but instead slept either on the couch in the living room or in the middle room. He testified that he had never seen the plastic baggies in the living room or

41

back porch. Appellant admitted to two convictions in 2006: distribution of a controlled dangerous substance and failure to register as a sex offender.

As stated above, the jury was free to believe some or all of the testimony and to choose inferences from the different facts presented. We are persuaded that a rational juror could conclude from the facts presented that appellant lived at the American Corner residence, that he was involved in drug dealing, and that he possessed, either individually or jointly, directly or constructively, the guns and drugs found in the bedroom and living room. *Cf. State v. Gutierrez*, 446 Md. 221, 237 (2016) (citing personal papers belonging to the defendants as evidence that they possessed drugs and gun found in apartment); *Kamara v. State*, 205 Md. App. 607, 633 (2012)(holding that jury could infer from the presence of male clothing and several items of mail that Kamara possessed the marijuana found in the bedroom).

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**